## BUSCAGLIA, Treasurer, v. BALLESTER.
### No. 4233.

Circuit Court of Appeals, First Circuit.
July 17, 1947.

806

I. Henry Kutz, Sp. Asst. to Atty Gen. (Sewall Key, Acting Asst. Atty. Gen., Helen R. Carloss, Sp. Asst. to Atty. Gen., and Mastin G. White, Sol., Department of the Interior, and Irwin W. Silverman, Chief Counsel, Division of Territories and Island Possessions, Department of the Interior, both of Washington, D. C., of counsel), for appellant.

Fred W. Llewellyn, of Washington, D. C. (J. J. Ortiz Alibran, of San Juan, Puerto Rico, and Leon, Weill & Mahoney, of Washington D. C., of counsel), for appellee.

Before CLARK, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal by the Treasurer of Puerto Rico from a judgment of the Supreme Court of Puerto Rico reversing a decision of the insular Tax Court and remanding the case to that court with instructions to enter a judgment for the appellee —a commercial partnership organized under the laws of Puerto Rico doing business in San Juan. The question presented is whether certain merchandise purchased by the appellee in Argentina, and admittedly owned by it, which arrived in San Juan Harbor on an Argentine Vessel on January 13, 1943, but which was not released by the United States customs authorities for unloading until January 18 or 20, 1943, was subject to the general ad valorem property tax assessed on January 15 of that year for the fiscal year 1943–1944 by § 297 of the Political Code of Puerto Rico.[1]

On that date of the assessment of this tax the merchandise had physically arrived within the territorial jurisdiction of Puerto Rico, and although not then unloaded or capable of being unloaded, it was on the stipulated facts destined to become, as in fact it later became, a part of the permanent mass of property in the Territory. On the critical date it had therefore acquired a taxable situs in Puerto Rico and in consequence the due process clause of § 2 of the Organic Act, 39 Stat. 951, 48 U.S.C.A. § 737, does not prevent imposition of the tax in question. Gromer v. Standard Dredging Co., 224 U.S. 362, 32 S.Ct. 499, 56 L.Ed. 801.

Nor does either the commerce clause, Art. I, Section 8, Cl. 3, or the clause prohibiting the imposition of duties or imposts on imports, Art. I, Section 10, Cl. 2, of the federal Constitution impose any barrier to the laying of the disputed tax.

The commerce clause gives Congress plenary power to regulate our foreign and interstate commerce and thus as a necessary consequence it has the secondary effect of a restriction upon the power of the states in the premises. It thus has two

---

[1] So far as here material this section provides: "That all personal property within or without Puerto Rico shall be assessed to the owner thereof in the municipality in which he resides on the fifteenth day of January. * * * *"

aspects, but in neither of them, either as a grant of federal power or as a necessarily consequential limitation upon state power, does it affect Puerto Rico. In its aspects of a grant of power to the federal government it adds nothing to the comprehensive power given to Congress by the Constitution, Art. IV, Section 3, Cl. 2, to legislate with respect to national territory, and it can have no consequential effect of limiting territorial action since Congress already has the power under Art. IV, Section 3, Cl. 2, supra, to limit such action to any extent it chooses, even to the extent of annulling local legislation. See § 34 of the Organic Act. 39 Stat. 951, 961, 48 U.S.C. A. § 822 et seq.

■ The constitutional prohibition upon the imposition of duties or imposts on imports is inapplicable because that prohibition is laid upon the states, and Puerto Rico, as we frequently have occasion to say, is not a state but an organized territory not incorporated into the United States. N.L.R.B. v. Padin Company, Inc., 1 Cir., 161 F.2d 353, and cases cited.

The actual question presented as we see it is whether Congress, in the exercise of its Constitutional power under Art. IV, Section 3, Cl. 2, to "make all needful Rules and Regulations" respecting the Territory of Puerto Rico, has seen fit to give the insular government power to impose the disputed tax.

In § 32 of the original Organic Act, the Foraker Act, 31 Stat. 77, 83, 84, and again in § 37 of the Organic Act of 1917, the Jones Act, 39 Stat. 951, 964, 48 U.S.C.A. § 821, Congress gave the insular government legislative power with respect to local matters in broad and comprehensive terms. People of Puerto Rico v. Shell Co., 302 U.S. 253, 261, 58 S.Ct. 167, 82 L.Ed. 235. And in § 3 of the Jones Act, supra, 39 Stat. at page 953, 48 U.S.C.A. § 741, Congress gave the insular government specific power to impose taxes by providing "That no export duties shall be levied or collected on exports from Puerto Rico, but taxes and assessments on property, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments respectively, as may be provided and defined by the Legislature of Puerto Rico." Sweeping as this language is, doubts arose as to the power of the insular government under the rule of Brown v. State of Maryland, 12 Wheat. 419, 6 L.Ed. 678, to impose its taxes on goods brought into the island while still in the original package (see Puerto Rico Tax Appeals, 16 F.2d 545, 548, 549;[2] West India Oil Co. v. Domenech, 311 U.S. 20, 27, 61 S.Ct. 90, 85 L.Ed. 16), with the result that § 3 of the Jones Act was amended on March 4, 1927 by § 1 of the Butler Act.[3] 44 Stat. 1418, 48 U.S.C.A. §§ 741, 741a. By this amendment the words "income taxes" were added after the phrase "taxes and assessments on property" in the first sentence of § 3 of the Jones Act, and in addition a proviso was appended to the end of that section so that it now reads so far as pertinent:

"Sec. 3. That no export duties shall be levied or collected on exports from Puerto Rico, but taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and munic-

---

[2] Reversed for lack of jurisdiction by reason of a subsequently enacted statute sub nom. Smallwood v. Gallardo, 275 U.S. 56, 48 S.Ct. 23, 72 L.Ed. 152.

[3] The committee report on this section of the Butler Act states:

"In making use of the authority granted by section 3 to levy and collect internal-revenue taxes the government of Puerto Rico has found itself unable to collect said taxes on articles purchased in and sent from the United States to Puerto Rico by mail, or sometimes when said articles are sent by vessel, as the courts have held that the post-office or customs officials have no authority to withhold delivery of such articles subject to the internal-revenue tax until the tax is paid, as such tax collected in this manner is in effect a customs duty. In other words, the courts have held that the internal-revenue tax can not be collected while the article subject to the tax is in the original package.

"This condition of affairs has practically nullified the power of the insular government to levy internal-revenue taxes, and therefore the efficacy of this source of revenue has been seriously impaired."

ipal governments, respectively, as may be provided and defined by the Legislature of Puerto Rico; * * *

"And it is further provided, That the internal-revenue taxes levied by the Legislature of Puerto Rico in pursuance of the authority granted by this Act on articles, goods, wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, sold, used, or brought into the island: Provided, That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico. * * *"

Thus in the first sentence of § 3 of the Jones Act, as it now stands, Congress gives the insular legislature power to impose certain specifically enumerated taxes, as property taxes, income taxes, internal revenue taxes, license fees, etc., and in a proviso at the end of that section Congress gives the insular legislature express permission to impose its internal revenue taxes, but its internal revenue taxes only, on such articles as are subject thereto "as soon as the same are * * * brought into the island." At first glance this phraseology might perhaps suggest the implication, first, that absent the Butler Act, the insular legislature would lack power to tax imported goods while in the original package, and, second, that Congress intended the phrase "internal-revenue taxes" in § 3 to describe some narrow classification of taxes, comparable to property taxes or income taxes, and then to permit the insular government to impose that narrow class of taxes, but that class only, on goods subjected thereto as soon as such goods are "brought into" the Territory. And the legislative history quoted in footnote 3 supra gives some support to this implication.

■ But the words "internal-revenue taxes" do not describe a narrow category of taxes. They are used to describe any tax which a government may impose except duties on imports. That is to say, they are used to describe all taxes in general derived from internal sources as contrasted with taxes derived from external sources. If the phrase "internal-revenue taxes" was used in the Butler Act to define some more narrowly limited category of taxes than this, we are at a loss to know what taxes were intended to be included in that limited category. And we think the Supreme Court must have interpreted the phrase as covering all taxes from internal sources, and hence all the taxes enumerated in the first sentence of § 3 of the Jones Act, when in West India Oil Co. v. Domenech, 311 U.S. 20, 27, 28, 61 S.Ct. 90, 92, 85 L.Ed. 16, it said that the "plain purport" of the proviso added by § 1 of the Butler Act "is that *any* (emphasis supplied) tax authorized by the Organic Act with respect to articles of domestic production may likewise be levied with respect to imported articles 'as soon as they are manufactured, sold, used, or brought into the island' provided only that there be no tax discrimination between articles brought from the United States and foreign countries and domestic articles," and then, after discussing the reasons for the Butler Act amendment mentioned above, went on to say:

"The doubts and the difficulty were removed by the amendment to § 3, giving the Congressional consent that articles should be subject to the taxing jurisdiction of the Puerto Rico legislature as soon as brought into the Island whether from the United States or from foreign countries, and directing that the United States customs officials and postal service should aid local officers in the collection of the tax. The effect of the broad language of the amendment was not only to subject to taxation all imported goods, whether from the United States or foreign countries, when brought into the Island in the original package, but to neutralize the regulatory effect of the customs laws and regulations in so far as they protected articles from local taxation after their arrival. Merchandise in the original package was thus subjected to tax when brought into the Island without regard to customs regulations."

■ From this language we conclude that even though the particular application of the insular general property tax to the appellee's merchandise may make that tax in its effect a duty or impost on imports, nevertheless it is a tax which Congress in

the exercise of its plenary power in the premises has authorized the insular legislature to impose.

The judgment of the Supreme Court of Puerto Rico is vacated and the case is remanded to that court with directions to enter judgment consistent with this opinion.