JOSÉ CHABRÁN GÓMEZ, Plaintiff and Appellee, *v.* BULL INSULAR LINE, INC., Defendant and Appellant.

No. 9680. Argued June 2, 1948.—Decided July 29, 1948.

*Charles R. Hartzell* and *Rafael O. Fernández* for appellant.
*Bauzá & Bauzá* for appellee.

MR. JUSTICE SNYDER delivered the opinion of the Court.

In 1942 José Chabrán Gómez sued Bull Insular Line, Inc. in the district court for unpaid wages. The amended complaint alleges that the plaintiff has worked for the defendant as a clerk from 1920 to date; that from 1935 to 1942 the plaintiff worked eleven hours a day; and that under Act No. 49, Laws of Puerto Rico, 1935, Special Session, the defendant owed him $3,191.22 for the hours worked in excess of eight hours a day during those years. After a trial on the merits, the lower court entered judgment in favor of the plaintiff for $1,079.31, and the defendant appealed.

I

▇▇▇▇ The first error is directed against the ruling of the district court that Act No. 49 applies to the plaintiff. The defendant argues (a) § 4 provides that Act No. 49 shall not apply to a "representative" of an employer; and (b) the plaintiff was a "representative" of the employer as that term is used in §4 and was therefore not entitled to the benefits of the Act. We believe the lower court correctly overruled both these contentions.

As to (a), § 4 provides that "*Employer* includes every natural or artificial person and the manager, superintendent, foreman, majordomo, or representative of said natural or artificial person. . . ". But that is by no means a provision that Act No. 49 does not apply to foremen and representatives *as employees*. Act No. 49 is not a wage law; it is a maximum-hour statute whose sole purpose is to limit the hours of work of a normal day, *Cardona* v. *District Court*, 62 P.R.R. 59, 62. The Legislature if it had chosen could have followed the example of other Acts, whether they be minimum-wage or as here a maximum-hour statute or both, and could have inserted in Act No. 49 a provision specifically exempting from its terms certain types of employees. Compare § 13 of the Federal Fair Labor Standards Act, 29 U.S.C. § 213, specifically exempting from its terms executive, administrative and professional employees *as employees;* Act

No. 379, Laws of Puerto Rico, 1948, superseding Act No. 49 which defines "employee" and provides (§ 19) that "The word 'employee' shall not include executives, administrators, or professionals." But Act No. 49 contains no provision exempting any *employees* as such from its terms or even defining employees. Instead it provides sweepingly and without exception in § 1 that "*No person* shall be employed or shall be permitted to work in any commercial, industrial, or agricultural establishment or in any other lucrative business more than eight (8) hours during any natural day . . . ". (Italics ours). This on its face includes all persons who are employees, whether or not they be "representatives" of the employer.

The question then arises—if a representative is an *employee*, why did the Legislature also define a representative in § 4 as an *employer?* The answer is obvious. Act No. 49 not only establishes an eight-hour day and double pay for the ninth hour. It also provides criminal sanctions in § 8 for violations of Act No. 49. *Cardona* v. *District Court, supra.* But if the criminal sanctions had been directed solely against owners of establishments, it might have been easy for employers to evade them by hiding behind the fiction that the foreman or representative, and not the employer, had permitted work in excess of eight hours. "Employer" was therefore defined in § 4 to include a foreman or representative to make it more difficult for employers to evade the Act: a foreman or representative was not likely to assert falsely that he had permitted work beyond eight hours in violation of orders of the employer if he knew he would be jailed for his action. It is true that by virtue of § 4 this makes a foreman or representative "the employer", from the point of view of the men working under his orders. Indeed, we have upheld conviction of a foreman on that theory under § 8 of Act No. 49. *People* v. *Soler*, 62 P.R.R. 646. But a foreman or representative, so far as his own interests are concerned, is an employee vis-á-vis the owner of the

establishment, who is the true employer. And inclusion in § 4 of foremen and "representatives" as *employers*, to prevent evasion of § 1 and for effective enforcement of § 8, is by no means the equivalent of a specific exemption making the terms of Act No. 49 not applicable to foremen and representatives as employees.[1]

In its argument on (*a*), the defendant also relies on testimony that when Act No. 49 went into effect in 1935, the Commissioner of Labor informed the various shipping companies at a conference that the Act did not apply to clerks in this category because they were representatives of the company. We assume that the Commissioner had the power to make administrative interpretations of Act No. 49, which originated in his Department, *Cardona* v. *District Court*, *supra*, p. 63, footnote 1, and which by § 5 he was required to enforce. And we assume that this verbal statement made by the Commissioner in informal conference constituted an administrative interpretation or regulation. *Cordero* v. *Prensa Insular de Puerto Rico, Inc.*, F. 2d (C.C.A. 1, July 23, 1948) ; *Liggett & Myers Tobacco Co.* v. *Buscaglia, Treas.*, 64 P.R.R. 75, affirmed in 149 F. 2d 493 (C.C.A. 1st, 1945). However, no regulation may violate the clear terms of a statute. Regulations may fill minor lacunae in a statute, furnish details as to its operation, or clarify doubtful or

---

[1] A similar problem arises from the definitions of employer and employee in the Puerto Rico Labor Relations Act, § 2 of Act No. 130, Laws of Puerto Rico, 1945, as amended by Act No. 6, Laws of Puerto Rico, 1946. Here again the term "employer" is defined in paragraph 2 as including "executives, supervisors and any person who carries on activities of an executive nature directly or indirectly in the interest of an employer . . . ". But that only makes a supervisor an "employer" in his relations with other employees who are his subordinates. To determine if a supervisor is himself an employee for purposes of this Act we must turn to the definition of an employee. Paragraph 3 provides that "The term 'employee' shall include any employee and shall not be limited to employees of a particular employer, unless the Act expressly provides to the contrary. . . The term shall not include executives or supervisors." We thus see that the Legislature specifically exempted "executives or supervisors" as employees from this Act; but it made no such provision in Act No. 49.

256 ambiguous provisions. *Puerto Rico Ilustrado* v. *Buscaglia, Treas.*, 64 P.R.R. 870, 892. But "when a statute is clear, no [interested party] can take refuge in an administrative interpretation or regulation to the contrary." *Idem*, p. 892. An administrative interpretation or regulation which as here is in conflict with the explicit terms of a statute cannot stand. *Colón* v. *Tugwell, Governor*, 65 P.R.R. 869, 872. The Legislature did not in § 4 except "representatives" in their capacity as *employees* from the terms of Act No. 49. The Commissioner of Labor therefore had no authority to grant such an exemption when it was not provided by law.

As to (*b*), even if we were to interpret § 4 of Act No. 49 as providing for an exemption of "representatives" of an employer from the benefits of Act No. 49 we believe the lower court was correct in holding that the plaintiff was not a representative within the meaning of § 4. Literally, every employee "represents" his employer when engaged in the performance of his duties. But no one takes the absurd position that all employees are exempt from the terms of Act No. 49 by virtue of § 4. It is obvious that in the context of § 4 a representative is not an employee who performs routine manual or clerical labor. Rather he is someone who acts and speaks for the employer on matters requiring the exercise of judgment. For example an employee who had other employees working under him whom he had the power to hire and fire would probably fall in this category.

Was Chabrán a representative of the plaintiff in this sense? The comptroller of the company testified as follows: "Q. In what way did Chabrán represent the company? A: He represented the company, if he was working, delivering cargo. He signed a document representing the company to the effect that he was delivering to the consignee. He signed as though it had been delivered by the company. If he was working receiving cargo Mr. Chabrán signed a dock receipt which committed the company with reference to the custody of that merchandise which had been received in good condi-

tion and if it was received in bad condition, he placed a note to that effect. So that he was obligating the company with respect to such merchandise."

The testimony that Chabrán "represented" the company was a legal conclusion which neither the lower court nor this Court is bound to accept. We accept the testimony as to the facts, but draw our own legal conclusion as to whether those facts require a holding that Chabrán was a representative as that term is used in § 4.

In arguing that the plaintiff was its representative, the defendant emphasizes the fact that the plaintiff's signature with reference to cargo bound the company. It is true the latter is responsible for the acts of the plaintiff in handling cargo and in signing for it. But an employer is civilly liable if his chauffeur while performing his duties, kills a person, or if an ordinary messenger fails to perform properly his duties to receive and deliver goods. The test is not the fact that the employer is responsible for the acts of the employee. Rather, as we have seen, it is the nature of the employee's duties and his responsibilities in the exercise of judgment and discretion on behalf of the employer.

The plaintiff had no authority to hire or fire others; indeed no one worked under him and he had no authority to give orders to laborers. His sole function was to check cargo into and out of the dock. The superintendent and the foreman were in charge of loading cargo on, and unloading cargo from the ships. In Part II the company argues that the claim herein has prescribed because Chabrán was not a permanent employee and only worked whenever the company notified him that there was work available for him on the dock. That type of employee scarcely comes within the classification of representative who under § 4 is defined as an *employer*. In fact as no one worked under him, Chabrán was not even a "representative" under the theory set forth in (a) that such employees may be prosecuted as employers under § 8 for violation of Act No. 49.

The district court did not err in holding (a) that § 4 does not provide that Act No. 49 shall not apply to a representative" of an employer; and (b) that even if § 4 did so provide, the plaintiff is not a "representative" as that term is used in § 4.

## II

■ The defendant assigns as the second error the refusal of the lower court to hold that the claim of the plaintiff for wages corresponding to the period prior to June 30, 1939 had prescribed in view of the manner in which the plaintiff performed his work and was paid.

Section 1867 of the Civil Code, after providing for a three-year statute of limitations for suits by employees for unpaid wages, states that the "time for the prescription . . . shall be counted from the time the respective services have ceased to be rendered."

The comptroller of the company testified that the employment of Chabrán was not "permanent", but that he worked only when he was needed. The plaintiff also testified that he worked only when notified by the company. The latter therefore argues that Chabrán was not obligated to work for the company continuously, but that he worked by the day when he was needed; that his work was considered as terminated on any day of the week, depending on the work available; and that when he was paid for his work, he had no assurance that he would work again, so that his employment terminated each time he was paid. The defendant then contends that under these circumstances the plaintiff "ceased to render the respective services" each time he was paid for work done; and since the complaint was filed on June 30, 1942, the claim for work prior to June 30, 1939 has prescribed pursuant to § 1867.

The conclusion that the comptroller drew that Chabrán was not a "permanent" employee of the company is not supported by the facts. The district court found that Chabrán worked as follows: in 1935, about 3½ days a week; in 1936,

an average of 5½ to 6 days a week; in 1937, almost always 6 days a week; in 1938, an average of 5½ days a week; in 1939, an average of 4½ to 5 days a week; in 1940 an average of 5½ to 6 days a week; in 1941 an average of 6 days a week; in 1942, an average of 6 days a week. This finding is substantially sustained by the books of the company, which show that Chabrán worked as follows: in 1936, 261 days, including 56 "half-nights" with seven weeks' records missing; in 1937, 287 days, including 112 half-nights with four weeks' records missing; in 1938, 246½ days, including 74 half-nights; in 1939, 246 days, including 105 half-nights; in 1940, 283½ days, including 118 half-nights; in 1941, 309½ days, including 140 half-nights; in 1942 up to June 26, 152 days, including 77 half-nights.

We do not stop to inquire if the theory of the defendant would prevail if Chabrán had worked only occasionally for the company over a period of years. Nor do we determine if this contention would be successful with reference to an employee like a stevedore who worked a large part of the year but shifted from company to company as work became available. See *Bay Ridge Operating Co., Inc.* v. *Aaron et al.*, 334 U. S. 446. Here Chabrán worked steadily not intermittently, for the defendant from 1920 to 1942. It is true that he did not work every day of the week. But whenever work was available he was notified and worked. This included many Sundays, nights and holidays. If the record showed he worked only a day or two a week for the company, perhaps we would be presented with a different question. But if the work record of Chabrán from 1935 to 1942 does not demonstrate regular, continuous employment of the plaintiff by the company it is difficult for us to visualize a case in which any employee who is paid by the hour or day could be placed in that category. We cannot conclude that the comptroller correctly characterized Chabrán as a non-permanent employee in the face of the company's own records.

Under the foregoing facts, the rules we have laid down in our cases do not bar the plaintiff's claim for work done more than three years prior to the date of the filing of the complaint. In *Muñoz* v. *District Court*, 63 P.R.R. 226, we held that under § 1867 the period of prescription began to run from the date the workman quit his job, and not as the defendant contends here from the end of each week when he was paid. And in denying the motion for rehearing we rejected the contention that where services as here are contracted for an indefinite period with weekly pay, there is a presumption that the contract expires weekly, with prescription beginning to run after each weekly payment.

In *Jiménez* v. *District Court*, 65 P.R.R. 35, we pointed out that under the *Muñoz* case the employee must render his services uninterruptedly. But we said (p. 38) "we are not to be understood as holding that every interruption of service starts the running of the statute for prior services. . . . Such things as brief illness of the employee, breakdown of machinery or *temporary lack of work* would not accomplish that result." (Italics ours). Here Chabrán worked regularly for years for the company. He occasionally missed a day of work solely because of "temporary lack of work". Such interruptions therefore did not under the *Jiménez* case start the running of the statute of limitations. See also, *Valiente & Co.* v. *District Court*, 68 P.R.R. 491.

The district court did not commit the second error. It held correctly that under § 1867 the manner in which the plaintiff performed his work and was paid did not bar claims for work done more than three years prior to the date of the filing of the complaint.

### III

■■ In the third assignment the defendant attacks the holding of the district court that the period of prescription did not begin to run on January 1, 1938 with reference to claims for work done prior to that date. The theory of the company is that the statute began to run on January 1, 1938

because a new contract between the parties went into effect on that date.

On January 3, 1938 the employees of the company including the plaintiff, and of other shipping companies went on strike. On February 10, 1938 the workers, through their union, and the shipping companies signed an agreement submitting the dispute to an Arbitration Board and the employees of the companies returned to work on February 12, 1938. On May 26, 1938 the Arbitration Board signed an opinion and award which provided that the award would operate as a collective bargaining agreement, for the period of one year from January 1 to December 31 1938, between the companies and the employees involved with the same effect as if the parties had executed such a contract on January 1, 1938. Both sides accepted the award. Conditions of work and salaries provided in the award were therefore followed during 1938.

We agree with the company that under the circumstances of this case the arbitration award, treated as a collective bargaining agreement for a year, was a wholly new arrangement by the defendant with its employees which terminated all existing arrangements and began a new period of service. As the new contract went into effect on January 1, 1938, the statute of limitations began to run on that date on claims for work prior thereto.

Our language in *Muñoz* v. *District Court, supra,* applies to this situation. In that case we said at pp. 237–238:

"But in the nineteenth century the Spanish Civil Code went into effect and its authors realized that there had been a change in the nature of the services rendered by the workman and that a process of renovation was under way which abolished the former contract and gave rise to a new contract. With this in mind they were undoubtedly prompted to limit the scope of the law of the Novísima Recopilación *so that the time for prescription would be computed from the day each contract expired without taking into account whether the workman remained in the same employment.* And giving expression to their thought,

they prescribed in the last paragraph of § 1867 of the Civil Code the following:

" 'The time for the prescription of actions referred to in the next three preceding paragraphs shall be computed from the time the *respective* services were last rendered.' " (First italics ours).

In the *Jiménez* case, we held that (pp. 38–39) "when a plaintiff leaves his employer in a year-round industry for *months* or years and *no explanation* therefor is vouch-safed, he ceases at that time to render services to his employer within the meaning of § 1867." (Italics ours). And we went on to point out that (p. 39) "The fact that he may and does return to the same employer to perform the same work under the same arrangement is immaterial. When he breaks off the old arrangement, the statute by its very terms begins to run as to all previous services."

Here the explanation for interruption of services was a strike of six weeks' duration and a new contract, containing new conditions of work and salaries for the entire industry. But that is not the type of "explanation" contemplated by the *Jiménez* case, where illness, breakdown of machinery or temporary lack of work are given as examples of explanations which are sufficient to prevent the running of the statute. None of these illustrations involves voluntary action on the part of the employee. Here Chabrán voluntarily left the employ of the defendant because he was dissatisfied with the terms of his employment. After a month and a half, he returned to work under a new contract. It is true that in his particular case the only change was a 25 per cent increase in salary. But the new contract made a number of substantial changes in the operations and working conditions of the employees of the industry as a whole. The combination of interruption of services for a month and a half and a new contract satisfy us that in this particular case the statute of limitations, under the language just quoted from the *Muñoz* and *Jiménez* cases, began to run from

January 1, 1938, the date of the new contract, on claims for work done prior to that date.

In coming to the contrary conclusion, the district court relied on a statement in *Avellanet* v. *Porto Rican Express Co.*, 64 P.R.R. 660, 666, that "there must at least be a true change in the type of work performed by the employee." But this language was used with reference to the particular situation in that case. There the claim was made that the statute began to run solely because the employee, a clerk who had been receiving and dispatching local freight, began to handle freight moving in interstate commerce after the Federal Fair Labor Standards Act went into effect. We held that this was not a change in the nature of his services, as he continued to do exactly the same work as he had always done. But the *Avellanet* case did not involve the effect of a new contract. We made this clear when we pointed out that (p. 666) "There is nothing in the record to show (a) either that the work of a clerk on interstate freight is different from the same functions performed for local freight, or (b) that the parties as between themselves—without reference to the new Federal Act—entered into a new contractual arrangement." The difference between this and the *Avellanet* case precisely is that (b) did occur here: the parties, after an interruption of service for six weeks caused by a strike, did as between themselves enter into a new contractual arrangement.

Chabrán contends and the district court held that to treat the interruption of services caused by the strike as starting the running of the prescriptive period would be to impair the right to strike. We cannot agree. In the first place, we note that under the facts of this case the new contract, together with the interruption caused by the strike, rather than the latter alone, started the running of the statute. But what is more important is that we find no incompatibility between the right to strike and the rule we lay down here.

In the *Jiménez* case we said that (p. 39) "As we pointed out in the *Muñoz* case on rehearing (p. 235), the statute in its practical operations is already highly unreasonable. We shall not make it more so by distorting its plain provisions. . . ". We were referring to the language in the *Muñoz* case found at pp. 238–9:

"It is unnecessary for the workman, and even unjust to the employer, *considering the modern means of defense available to the former to defend his own rights,* that the employer should be under a constant fear of being sued for unpaid wages during the whole existence of the contract of services not having a fixed period and even within three years after the respective services were last rendered. In many cases the employer runs the risk of losing the evidence which he could have used for his defense if the action had been brought against him within a reasonable time; in other cases the amount of the compensation sought might increase to such proportion that a judgment against him might cause his ruin economically. But these considerations, just and reasonable as they are, should be brought before the Legislative Assembly and not before the courts of justice, who are estopped from passing judgment on the soundness and wisdom of a law." (Italics ours).

The fundamental theory on which § 1867 is predicated —that an employee will be afraid to sue his employer while he remains in his employ—is outmoded, at least where as here a powerful union represents the employees in negotiating collective bargaining agreements. We take judicial notice that the six-week strike involved herein paralyzed almost all economic activity on this island, which is dependent on the shipping industry for its existence. The plaintiff and his colleagues had an unfettered right to engage in this strike. But no one who lived through it could reasonably say that it showed timidity and fear on the part of the employees toward their employers.

This theory will no longer bear inspection in many cases in the light of modern conditions under which (1) organized labor engages through unions in collective bargaining with

employers, often as here on an industry-wide basis; (2) the insular Labor Department, through its Conciliation Service and its attorneys who conduct private litigation on behalf of workers, protects the rights of the latter; (3) a Minimum Wage Board establishes minimum wages, maximum hours and working conditions for entire industries; (4) Federal and insular Boards exist to prevent unfair labor practices by employers; (5) Federal and insular statutes make it a crime for an employer to discharge or otherwise discriminate against an employee because he sues the former for unpaid wages, 29 U.S.C. § 215 (a) (3) ; § 18, Act No. 379, Laws of Puerto Rico, 1948.[2]

In this very case, the plaintiff has not felt it necessary to wait until he leaves the employ of the company to sue for unpaid wages. This suit was filed in 1942. It was tried in 1945. Yet the plaintiff has worked for the company from 1920 to date.

Congress has chosen to withdraw the question of prescription of claims under the Fair Labor Standards Acts from the realm of local law. And in doing so, it recognized that, in view of all the safeguards which now surround workmen, there is no necessity for a statute of limitations which begins to run only after the employee ceases to work for the employer, a date which may be twenty or thirty years after the alleged claim arose. It has provided a prescriptive period of two years after accrual of the cause of action. Section 6 of Portal-to-Portal Act, 61 Stat. 84; see Romanacce, The Portal to Portal Act of 1947, XI *Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico* 87, 103–5.

---

[2] We are aware of the possibility that in appropriate cases both under the Federal and insular Labor Relations Acts it might be held that striking employees, or discharged employees, had never "left" the employ of an employer who is found to have engaged in unfair labor practices. But retention of the status of employee despite a strike or discharge arising out of unfair labor practices stems from positive laws which do not apply here and which seek to cure ills which are in no way related to the problem herein of an indefinite and prolonged statute of limitations.

Moreover, in addition to the fact that the need therefor no longer exists in many cases, it is illusory to believe that the burdens involved in keeping stale claims open for many years fall exclusively on employers. Faced with such a situation, no employer absorbs such costs. He sets up reserves or uses other business devices which enable him to pass these costs on to the general public. And it is difficult to see the justification for requiring the public to bear the burdens of such an unreasonable statute of limitations.

To paraphrase our language in the *Jiménez* case at p. 39, we shall not make this highly unreasonable statute even more unreasonable by distorting its plain provisions. The right to strike is in no way related with § 1867. Employees may strike. But if they do and win the strike thereby obtaining a new contract for services, there is no room for the contention that the former services have not been terminated. Section 1867 on its face applies to those facts and bars claims for work done prior to a new contract executed under these circumstances. We see no reason why we should strain to avoid its provisions and thereby make the statute ·even more unreasonable than its terms require.

The district court committed the third error in refusing to hold that under the facts herein the three-year statute of limitations began to run on January 1; 1938 on claims for work done prior to that date and consequently were barred because suit therefor was not filed until June 30, 1942.

## IV

■ The fourth assignment is that the lower court erred in not holding that claims for work done prior to January 1, 1939 had prescribed, because the three-year statute began to run on that date for work done prior thereto in view of the fact that another new contract had gone into effect on that date.

The arbitration award provided that the contract therein ·established would terminate on December 31, 1938. Under

it the hours of work of clerks like Chabrán were not changed. It provided only that they should receive a 25 per cent increase in salary. And the Fair Labor Standards Act, providing for minimum wages and fixing a maximum work-week, did not go into effect until October, 1938.

On December 30, 1938 the company issued a printed leaflet "To the Stevedores and Clerks of San Juan and the Island of Puerto Rico". This leaflet recited that ". . . from January 1 to December 31, 1939 . . . 1. The company will continue to carry out the clauses in favor of the workers, of the award of the Arbitration Committee which have been in effect during 1938. 2. The Company will continue paying the same salaries it has paid during 1938. . . . 5. The Wages and Hours Act will be complied with in every detail in favor of all personnel, both office and dock." The leaflet also provided as follows:

"All clerks have been favored with salaries to be earned in accordance with the hours they work.

"Personnel employed as clerks . . . will be paid as follows:

"1. $3.75 per work-day and $5.00 per holiday.

"2. A work-day shall consist of eight hours between 8:00 a. m. to 12:00 m. and from 1:00 p. m. to 5:00 p. m.

"Any portion of time worked from 8:00 a. m. to 12:00 m. and from 1:00 p. m. to 5:00 p. m. shall be considered a half day of work.

"4. Work done outside of regular hours will be paid for at the rate of 62¢ an hour, provided that for any work done from 6:00 p. m. to 8:00 a. m., if more than two hours is worked, the pay will be a minimum of $2.50.

"5. For any time that is worked in excess of the 44 hours during a work-week, that is from Saturday to Friday, payment for the excess hours will be paid at the rate of 70 cents an hour, that is, at time and a half."

The defendant contends that by this notice it was provided for the first time (1) that all clerks would be paid "in accordance with the hours they worked"; (2) that the work-day of clerks was 8 hours; and (3) that hours worked

in excess of 44 hours a week would be paid for at 1½ times the regular rate. The company therefore argues that these new conditions resulted in a new contract as of January 1, 1939, and that, for the reasons stated in III, on January 1, 1939 the statute began to run on all claims for work done prior to that date.

There would be more force to the company's contention if the parties had negotiated and entered into a new collective bargaining agreement. But the mere announcement by the company that it was rearranging its wage-and-hour structure to conform to the new Federal Act did not bring into play the rule we have laid down in III with reference to § 1867. As we pointed out in the *Avellanet* case, there must at least be some evidence (p. 666) "that the parties as between themselves—*without reference to the new Federal Act*—entered into a new contractual arrangement." (Italics ours). It is true that the eight-hour day, not required by the Federal·Act, was established for clerks for the first time by this leaflet. But § 1867, as interpreted by the *Muñoz, Jiménez* and *Avellanet* cases, cannot be construed to mean that such a minor change in the relationship between the parties started the running of the. statute of limitations.

The district court did not commit the fourth error in refusing to hold that claims for work done prior to January 1, 1939 had prescribed on the theory that (1) a new contract was effected on that date, (2) the statute therefore began to run on that date, and (3) the three-year statutory period had expired before suit therefor on June 30, 1942.

V

The fifth assignment is directed against the holding of the district court that Act No. 49 of 1935 remained in effect after passage by Congress of the Fair Labor Standards Act of 1938.

The defendant argues that even if no conflict exists between Act No. 49 and the Federal Act, Congress has occupied

the entire field of wages and hours for employees of companies which, like the defendant, are engaged in interstate commerce and has thereby superseded such local Acts as Act No. 49.

Like the Fourteenth Amendment and the privileges and immunity clauses of the Constitution, the commerce clause does not apply to Puerto Rico because it is not a State but an organized territory not incorporated into the United States. *Ballester Hnos.* v. *Tax Court*, 66 P.R.R. 531, Part II, reversed on other grounds but approved as to this point, 162 F.2d 805 (C.C.A. 1st, 1947), cert. denied 332 U. S. 816; *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F.2d 96, 101 (C.C.A. 1st, 1946); *Buscaglia* v. *Tax Court; Pérez Vahamonde, Intervener*, 68 P.R.R. 322, and cases cited therein. Under these cases and *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, it might be argued that the commerce clause does not inhibit insular legislation on the same subject-matter covered by the Fair Labor Standards Act. But Congress has chosen in § 3 (*c*) of the Federal Act, 29 U.S.C. § 203 (*c*), to provide that " 'State' means any State of the United States or the District of Columbia or any Territory or possession of the United States." We therefore treat the case as though it had arisen in one of the States.

We recently pointed out in *Avila* v. *District Court*, 68 P.R.R. 10, 16, that "In the absence of a specific prohibition in a Federal Act against local legislation, the Insular Government may exercise concurrent power by enacting, under its police power, legislation covering the same subject-matter, provided the subject-matter is not so intimately blended and intertwined with responsibilities of the national Government that the very nature of the subject-matter in itself raises an inference that it is an exclusive concern of the national Government. *Bethlehem Co.* v. *State Board*, 330 U.S. 767, 772; *Hines* v. *Davidowitz*, 312 U.S. 52, 66; *Hill* v. *Florida*, 325 U.S. 538, 542; Grant, the Scope and Nature of Concurrent Power, 34 Col.L.Rev. 995."

The Supreme Court has indicated that "As a matter of statutory construction Congressional intention to displace local laws in the exercise of the commerce power is not, in general, to be inferred unless clearly indicated by those considerations which are persuasive of the statutory purpose." *Maurer* v. *Hamilton*, 309 U.S. 598, 614; *H. P. Welch Co.* v. *New Hampshire*, 306 U.S. 79; *S. C. Hwy. Dept.* v. *Barnwell Bros.*, 303 U.S. 177.

In the *Avila* case we went on to say that (p. 16) "Rent control is not so inextricably a national responsibility that the subject-matter as such requires us to hold that Congress, once it legislates on the subject, intends to occupy the field exclusively despite the failure of the Federal statute to prohibit specifically a local statute on the same subject," citing, among other cases, *Panhandle Pipe Line Co.* v. *Comm'n.*, 332 U.S. 507. We reach the same result with reference to wages and hours of employers engaged in interstate commerce. Congress did not preempt the field of standards relating to wages and hours of employees working in interstate commerce. It could have barred local legislation on any phase of the subject-matter. See *Latoni* v. *Municipal Court*, 67 P.R.R. 130. But instead of prohibiting local statutes, Congress affirmatively provided, perhaps out of an abundance of caution, in § 18 of the Fair Labor Standards Act that States could provide a higher minimum wage or a shorter maximum work-week than that established by the Act.

The argument of the company is that even without a conflict between the insular and Federal statutes, the former has been superseded because the latter has established *uniform* national standards which may not be impaired by local law. But apart from the fact that as we see below in discussing § 18 there are no standards whatsoever in the Federal Act as to a maximum work-day, the Federal Act does not establish *uniform* wage and hour standards. On the contrary, it only places a floor on hourly wages and a ceiling on the regular work-week. Employers may, and do, follow

more liberal standards, with the result that hourly wages and regular work-weeks are diverse, not uniform.

Consequently, in view of the absence of a specific prohibition in the Federal Act against a local Act, insular legislation supplementing the Federal Act is valid, provided the former is not in substantial conflict with the latter. *Cordero* v. *Prensa Insular de Puerto Rico, Inc., supra; Puerto Rico* v. *Shell Co., supra; Avila* v. *District Court, supra; Latoni* v. *Municipal Court, supra,* 138, footnote 1, paragraph 2; *Irizarry* v. *District Court,* 64 P.R.R. 90; *Ballester Hnos.* v. *Court of Tax Appeals,* 66 P.R.R. 531, 547, footnote 17, reversed on other grounds, 162 F.2d 805 (C.C.A. 1st, 1947), cert. denied 332 U.S. 816; *Luce & Co.* v. *Minimum Wage Board,* 62 P.R.R. 431; *Sucesores de José Fernández, S. en C.,* v. *Domenech, Treas.,* 60 P.R.R. 883, 888.

"What constitutes such a substantial conflict? The Supreme Court has said that the conflict or repugnance must be so direct and positive that the two Acts cannot be reconciled or consistently stand together. *Kelly* v. *Washington,* 302 U.S. 1, 10. Or stated another way, the local statute must not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Hill* v. *Florida, supra,* 542; *Hines* v. *Davidowitz, supra,* 67; *Allen-Bradley Local* v. *Board,* 315 U.S. 740, 749." *Avila* v. *District Court, supra,* p. 17.[2a]

The company asserts that such a conflict exists here. It makes two contentions on this point. The first is that under the Federal Act pay at $1\frac{1}{2}$ times the regular rate is required only if the employee works more than the maximum 40-hour work-week provided by the Act (during the first year of the Act, 44 hours; the second, 42). On the other hand, double pay for the ninth hour worked on any day is required by Act No. 49, irrespective of the number of hours worked a week.

[2a] See also, Notes, 60 Harv.L.Rev. 262; 61 Harv.L.Rev. 840 (May, 1948).

The Federal Act is silent on the subject of a maximum work-day. We are not convinced that the necessity of complying with a local law on that subject matter creates a conflict with the Federal Act providing for a maximum work-week. If the insular Act had enlarged the maximum work-week established in the Federal Act, we might have a different question. But here the work-day of an employer may be fixed at 8 or 9 hours as provided by Act No. 49 without in any way interfering with the 40-hour maximum work-week of the Federal Act. Many businesses are required under modern conditions to adjust their operations to conform to both Federal and insular statutes enacted within their respective spheres.

The second contention is that confusion and controversy arise from the effort to calculate the double pay for the ninth hour under Act No. 49. The company gives two examples: First, in calculating pay at 1½ times the regular rate of pay under the Federal Act after 40 hours a week, are ninth hours worked during the first 40 hours included at double or single rate in determining the regular rate of pay? Second, if a ninth hour is also the 41st hour of a week, is the pay therefor 1½ times the regular rate, or 2 × 1½?

These questions will have to be answered in appropriate cases. They do not arise here as the plaintiff makes no claim under the Federal Act. See footnote 6. It is true that the Federal Act has created these and other difficult situations as to what constitutes the regular rate of pay for purposes of pay 1½ times the regular rate for work in excess of 40 hours a week. *Bay Ridge Operating Co.* v. *Aaron, supra*. But we fail to see why that requires a holding that the two Acts are conflicting. Cf. *Avila* v. *District Court, supra*.

Finally, the company relies on § 18 of the Fair Labor Standards Act, 29 U.S.C. § 218, which reads in part as follows: "No provision of Sections 201–19 of this title or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a

minimum wage higher than the minimum wage established under such sections or a maximum work week lower than the maximum workweek established under such sections, and no provision of sections 201–19 of this title relating to the employment of child labor shall justify noncompliance with any Federal or state law or municipal ordinance establishing a higher standard than the standard established under such sections."

In § 18 Congress expressly permitted local minimum wage and maximum work-week statutes to subsist if they provided for higher standards than those found in the Federal Act. According to the company, § 18 by inference excluded from its terms local statutes establishing a maximum workday like Act No. 49, which therefore became inoperative for employees covered by the Fair Labor Standards Act after passage of the latter Act.

We are unable to agree with this contention. By enacting § 18 Congress made it clear that it was not preempting the field of standards relating to wages and hours in interstate commerce. It gave the States freedom of action to establish higher standards than those contained in the Federal Act. State legislation is superseded by the Fair Labor Standards Act only if the local statute provides lower standards than the Federal Act. The committee reports are consistent with this construction of the Act. These reports are quoted in part in C.C.H. Labor Law Service, par. 26,800, as follows:

"Section 16 of the Committee amendment provides that no provision of the act is to justify noncompliance with any other Federal or State law or municipal ordinance establishing a higher minimum wage *or a shorter maximum workday* or workweek than that established under the act, and that no provision of the act relating to the employment of child labor is to justify noncompliance with any Federal, State, or municipal ordinance establishing a higher standard than the standard established under the act. H. R. Rep. No. 2182, page 15, April 21, 1938, 75th Cong., 3d Sess.

"Section 18 which deals with the relation of the act to other laws follows the corresponding provision of the House amendment with the addition of a provision to the effect that nothing in the act is to be deemed as any justification for a reduction in wages or a lengthening of hours. Conference Committee Rep. No. 33, page 2738, June 11, 1938, 75th Cong., 3d Sess." (Italics ours).

The silence of § 18 on the subject of state statutes providing for maximum work-days does not mean that Congress intended to supersede such local legislation. On the contrary, as the House Report indicates, such Acts continued in effect. No specific reference was made to them in § 18 precisely because the Federal Act contains no provisions with respect to a maximum work-day. The Congress deemed it unnecessary to provide a saving clause for state legislation on a subject not included in the Federal Act. Cf. *Luce & Co.* v. *Minimum Wage Board, supra.*

The only cases in point which we have found reach a contrary conclusion. *Verdejo* v. *Bull Insular Line, Inc.,* United States District Court for Puerto Rico, Civil No. 2847, decided March 20, 1943; *Butte Miners' Union No. 1* v. *Anaconda Copper Min. Co.,* 118 P. 2d 148, 152–53 (Mont., 1941). We do not agree with the result reached in those cases and will not follow them. In *Sirmon* v. *Cron and Gracey Drilling Corporation,* 44 F.Supp. 29 (D.C., La., 1942) the court said (pp. 30–31) : "Congress has occupied the field of labor relations in such [interstate] commerce and the State no longer has any power to deal with the subject." We believe this statement was unnecessary to decide the question before the court. In any event, we think the quoted statement is too broad and is erroneous if applied to the situation before us. Cf. *Divine* v. *Levy,* 45 F.Supp. 49 (Dist.Ct., La., 1942). The defendant also relies on *Erie R.R. Co.* v. *New York,* 233 U.S. 671. However, we find nothing in that case which prevents the result we have reached, particularly in the light of the recent Supreme Court cases cited herein.

The district court did not err in holding that in providing for a maximum workday, Act No. 49, as applied to workmen in Puerto Rico who are employed in interstate commerce, does not conflict with the Fair Labor Standards Act which provides for a minimum wage and maximum workweek. Act No. 49 was therefore not superseded by the Federal Act.[2b]

## VI

 The 6th, 7th and 8th assignments are that the lower court committed manifest error in weighing the evidence (6) in holding that during the period covered by this suit the plaintiff worked ten hours daily, apart from night work; (7) in holding that the agreement between the parties was to pay a certain salary for only 8 hours of work for the period prior to January 1, 1939; and (8) in not holding that at the most the plaintiff was entitled to payment for ninth hours worked, at double the rate for preceding hours of work.

The judgment contains awards of $42.75 for 1935, $293.625 for 1936, and $322.875 for 1937. These portions of the judgment will be reversed in view of our holding in Part III that claims for work done prior to January 1, 1938 had prescribed when the complaint was filed on June 30, 1942.

As to 1938, we assume, *arguendo*, that the 6th error was not committed and that the finding of the lower court that the plaintiff worked ten hours a day during 1938 was correct. But the district court committed the seventh error as there is no substantial evidence in the record to support its additional finding that the agreement between the parties for 1938 provided for an eight-hour work-day to be paid for at the rate of $3.75.

The record shows that the arrangement in 1938 was for a daily wage, without reference to the number of hours to be worked. In his own testimony the plaintiff claimed he

---

[2b] Cf. § 5 and other provisions of Act No. 379, Laws of Puerto Rico, 1948, which is not involved herein.

was entitled to pay for work beyond eight hours "according to the law that had been passed". He did not testify that he predicated his claim on any agreement between the parties that the stipulated daily wage was for eight hours of work only. But as hereinafter noted, except for the ninth hour, Act No. 49 is not controlling; additional pay for work beyond the 8th or 9th hour is required at the ordinary rate only if an agreement exists that the daily wage shall cover only 8 or 9 hours of work.

On cross-examination, the plaintiff reiterated his testimony that there was no agreement between the parties restricting the daily wage to 8 hours of work: "Q: You say you made a calculation in order to make the claim that the company owes you that amount? A: Yes, sir. Q: Now you made that calculation on the basis that they had to pay double time, all double time? A: Not all, after 8 hours. Q: In spite of that you told the court that you worked eleven hours a day for 3 dollars a day? [3] A: Yes, because I was obliged to do it owing to the economic situation which required it and if we did not continue working, discriminations were committed. Q: You worked eleven, ten hours for the three dollars? A: Yes. Q: That was what you did? A: Yes."

The lower court concluded that the agreement between the parties was for an eight-hour day because, among other things, the company was relying on the statement of the Commissioner of Labor described in Part I that clerks as representatives of the company were not covered by Act No. 49. But that situation, if anything, requires the opposite conclusion: if clerks were not restricted to an eight-hour day, the company could negotiate with them for a longer work-day.

---

[3] During 1938, the plaintiff received $3.75 a day in view of the fact that the Arbitration Board awarded clerks a 25 per cent increase. But the award made no other changes, despite the fact that the clerks requested among other things that their regular work-day be fixed at 8 hours—8 to 12 in the morning and 1 to 5 in the afternoon.

The situation found herein has been covered by previous cases. In *Avellanet* v. *Porto Rican Express Co., supra,* we said at page 664: "Act No. 49 provides for an eight-hour work day. It permits work during the ninth hour, but requires double pay therefor. We have held that work after the ninth hour, although prohibited on pain of criminal penalty, must be paid for at the ordinary rate of pay. But the rule has been clearly established that whether anything is due as ordinary pay after eight hours depends on the contract of employment; that is, one who under a private agreement between the parties worked thirteen hours a day for a stipulated daily, weekly or monthly salary has already been fully paid under Act No. 49—which is not a minimum wage Act—except for the additional pay for the ninth hour, which under those circumstances is paid for at an hourly rate calculated by dividing the amount received by the total number of hours worked to earn the same. *Cardona* v. *District Court,* 62 P.R.R. 59; *Muñoz* v. *District Court,* 63 P.R.R. 226."

In the same case we said that (p. 680) "The plaintiff himself . . . proved that his arrangement was for a [daily] wage. There is absolutely nothing in the record to justify a finding that the said wage was intended to cover employment for eight hours a day only. Under the statute as it is not written,[4] the plaintiff was therefore paid in full except for double pay for the ninth hour." And see *García* v. *District Court, ante,* p. 142.

In view of the foregoing facts and cases, the lower court committed the 7th error in holding that the agreement between the parties was to pay a certain daily wage for only eight hours of work during 1938. And it follows from the same facts and cases that the district court also committed the 8th error in not holding that at the most the plaintiff was entitled for work done during 1938 to payment at double the regular rate for the ninth hour.

---

[4] Cf. Act No. 379, Laws of Puerto Rico, 1948.

We turn to the problem of modifying the judgment in the light of our rulings herein. For 1938, the judgment awarded the plaintiff (1) $165.91 for 176½ ninth hours, calculated at double rate: $3.75, divided by 8 hours = 47¢ × 2 = 94¢ an hour; and (2) $82.95 for 176½ tenth hours, calculated at 47¢ an hour.

The award for 176½ tenth hours, amounting to $82.95, will be eliminated, as we have held that it was covered by the contract to work for $3.75 daily. But as the quotation from the *Avellanet* case at p. 664 indicates, the plaintiff is entitled to double pay for the ninth hour "which under those circumstances is paid for at an hourly rate calculated by dividing the amount received by the total number of hours worked to earn the same."

The remaining $165.91 was awarded for 176½ ninth hours, between May 1, 1938 and December 9, 1938, at the double rate of 94¢ an hour. We are unable to agree with this finding either as to the number of ninth hours worked or the rate of pay for the ninth hours worked. We turn first to the number of ninth hours worked.

According to the records of the company, between May 1 and December 9, 1938, Chabrán worked eight hours a day on approximately 170 days and worked a number of other days less than eight hours a day. The district court apparently concluded that whenever the company reported an 8-hour day, Chabrán actually worked 10 hours. It therefore awarded him 176½ ninth hours.

In connection with the 6th error, we assumed, without deciding, that the regular work-day of the plaintiff was ten hours. But that issue cannot be avoided here. The company is a large enterprise with hundreds of employees. After October, 1938, these records were required to be kept by Federal law. And if false records were made, the company and its officers would be criminally liable therefor, 29 U.S.C. §§ 215, 216, *United States* v. *Darby*, 312 U. S. 100, 125.

Both before and after the effective date of the Federal Act, the company in 1938 kept a daily record of the work of all its employees, including Chabrán. The latter, like the rest of the employees, signed the payroll at the end of each week, showing the time worked each day. He and the other employees in this industry were members of a strong union which early in 1938 had won a strike. It is difficult to believe that immediately thereafter he would sign without protest payrolls reflecting eight hours of work and accept pay for only eight hours if his actual regular work-day were ten hours. There is always the possibility that some unscrupulous employer will keep false records. But there was not an iota of evidence or any finding of the lower court that the defendant company kept false records. And it is admitted that the regular hours for accepting and delivering cargo on the docks of the company during 1938 were from 8 to 12 in the morning and from 1 to 5 in the afternoon; if extra work was required, it was done during night hours and paid for at a higher night rate with a minimum for a fraction thereof.

In fact, the lower court in effect accepted the records of the company. From early in 1938 to May 1, 1938, the payrolls, signed by Chabrán, showed that he worked 8 hours a day, for which he received $3.75, calculated on the basis of 46⅞¢ an hour. For hours in excess of eight hours, the books showed he received 62¢ an hour. The lower court therefore awarded no ninth hour pay for this period. Nor did it grant ninth hours for any days which the records showed the plaintiffs worked less than eight hours.

But, despite its acceptance of the books of the company on these other occasions, the lower court apparently was of the view that the *regular* work-day was changed on May 1, 1938 from eight to ten hours because the payrolls beginning May 1 carried a "1" for time worked for $3.75 rather than "8 hours" as listed in the payrolls from January to May. But we fail to see the significance in this change in record-

ing the usual time worked—eight hours—in view of the fact that the rates both for day and night work remained the same.

· In view of all the circumstances, we are constrained to hold that the lower court committed manifest error in holding that the plaintiff worked 176½ ninth hours during 1938. See *Vélez* v. *Royal Bank,* 65 P.R.R. 912. We accept the records of the company showing that 68 ninth hours were worked during 1938.

The question remains as to the rate of pay for ninth hours worked during 1938. As we have seen, the district court awarded $165.91 for 176½ ninth hours, calculated at the double pay rate of 94¢ an hour. But it thereby failed to take into account that pay at the 62¢-an-hour rate for extra hours worked had already been received by the plaintiff for the ninth hour. Consequently, pursuant to Act No. 49, the defendant still owed Chabrán for each ninth hour worked only 32¢ an hour for 68 ninth hours, or $21.76.[5] To the latter figure, we add $1.28, which the district court found and the company does not deny it owes, in connection with 4 ninth hours worked in December, 1938.

The judgment of the district court for the period from January 1, 1939 to June 30, 1942 presents no problem, either of fact or law. Both parties concede that under the leaflet set forth in Part IV, during those years the plaintiff received (1) a salary of $3.75 for a regular eight-hour work-day, (2) 62¢ an hour for work done outside the regular work hours and (3) as a new provision, 70¢ an hour for work in excess of the maximum work-week provided by the Fed-

---

[5] The company might have contended that the regular rate of pay for the ninth hour is ascertained by dividing the daily wage of $3.75 by ten, instead of eight, hours. See Part VI, discussion of 7th and 8th errors. But the company, consistent with its position that its regular workday consisted of eight hours, used, to the benefit of the plaintiff, 8 instead of 10 as the divisor in order to determine the regular rate of pay for the ninth hour for the purpose of granting double the regular rate for that hour.

.eral Act.[6] And the district court accepted the records of the company showing the number of ninth hours worked from 1939 to 1942. We thus see that for ninth hours so worked the plaintiff received 62¢ an hour (or 70¢ an hour when work was done beyond the Federal maximum work-week) whereas the lower court correctly held that, pursuant to Act No. 49 and the cases cited herein, compensation for these ninth hours should have been double the regular rate; i.e., $3.75, divided by 8 = 47¢ an hour × 2 = 94¢ per ninth hour.

Although the district court accepted the number of ninth hours worked as reflected in the books of the company, it made a minor error in the figures for 1939 to 1942. It assumed that ninth hours were always paid for at 62¢ an hour, whereas on a few occasions the plaintiff received 70¢ an hour for work beyond the Federal maximum work-week. We therefore accept the findings of the lower court as to the number of ninth hours worked from 1939 to 1942, but we adjust the compensation to provide: (1) if the plaintiff received 62¢ an hour for a ninth hour, he is now entitled to additional compensation therefor at 32¢ an hour; (2) if he received 70¢, his additional compensation is 24¢ per hour.

It remains only to note that the plaintiff worked 112½ ninth hours in 1939; 127½ in 1940; 201½ in 1941; 89½ from January 2 to June 26, 1942. He should have been paid 94¢ an hour therefor. Instead he was paid 62¢ an hour in most cases and 70¢ an hour in some cases. He is therefore entitled either to 32¢ or 24¢ an hour, whichever is appropriate, for these ninth hours.

For the reasons stated, the judgment of the district court will be modified to provide that the plaintiff shall receive, for ninth hours worked, the following: (1) 1938, $21.76 plus $1.28, or $23.04; (2) 1939, $34.76; (3) 1940, $36.76; (4) 1941, $55.80; (5) 1942, $24.99, making a total of $175.35.

---

[6] The parties do not argue the question of any alleged claim stemming from the Fair Labor Standards Act, and we do not consider it. Cf. *Avellanet* v. *Porto Rican Express Co., supra,* pp. 666–80; *Bay Ridge Operating Co., Inc.* v. *Aaron et al., supra.*

Although Mr. Justice De Jesús did not participate in the hearing of the case, he concurs in the opinion of the Court.

---

MR. JUSTICE TODD, JR. dissenting as to Part IV of the opinion of the Court.

I dissent as to the conclusion reached by the majority in connection with the fourth assignment. I believe that the printed leaflet issued by the company and accepted by the employees established a new contract between the parties, particularly for the clerks like plaintiff, since as to them, it established different conditions of work and pay than those fixed in 1938 which were accepted by the plaintiff and, for the reasons stated in considering and disposing of the third assignment, claims prior to January 1, 1939 have prescribed. The *dictum* in the *Avellanet* case remains unaffected nor is it in point, inasmuch as the new terms do not wholly refer to the new Federal Act.

I would, therefore, eliminate the amount of $23.04 for 1938 and grant to the plaintiff the amounts stated in the opinion for 1939, 1940, 1941 and 1942, making a total of $152.31.