El Juez Asociado Señor Feliberti Cintrón
emitió la opinión del Tribunal.
La controversia planteada a través de este recurso in-cide en las limitaciones a la facultad reguladora del Go-bierno de Puerto Rico (Gobierno) en aquellos asuntos donde se ve afectado el comercio interestatal. Esta se cir-cunscribe a determinar si es constitucional una ley que impone a una parte pagar contribuciones que culminan en el fínanciamiento de una campaña publicitaria que atenta contra sus intereses económicos. Para poder atenderla nos toca resolver en esta ocasión si la Cláusula de Comercio de la Constitución de Estados Unidos de América (Constitu-ción Federal), en su aspecto durmiente, aplica a Puerto Rico.
r — H
La controversia tiene su génesis en una demanda en cobro de dinero instada por el Gobierno, a través del Secre-tario de Hacienda, para reclamar de Northwestern Selecta, Inc. (Northwestern o la peticionaria), en su calidad de im-portadora de carne de res en Puerto Rico, el pago de apor-taciones presuntamente adeudadas al Fondo para el Fo-mento de la Industria de la Carne de Res (Fondo), según provisto en la Ley Núm. 95-1992 (5 L.P.R.A. sees. 3001— 3012) (Ley Núm. 95).
Northwestern, por su parte, ha resistido reiterada-mente los intentos de cobro del Gobierno alegando como defensa, entre otros, la inconstitucionalidad de la Ley Núm. 95.
Los argumentos legales interpuestos por la peticionaria como fundamento para oponerse al pago de la deuda en cuestión fueron descartados por el foro primario. A estos efectos, el Tribunal de Primera Instancia (TPI) denegó la solicitud de sentencia sumaria sometida por Northwestern y en su lugar concedió la contrapropuesta del Gobierno, va- *49 lidando de este modo el cobro de los dineros ascendentes a trescientos un mil quinientos veintiséis dólares con vein-tiocho centavos ($301,526.28).
Por su parte, el Tribunal de Apelaciones no encontró vicio constitucional en el estatuto en controversia al am-paro de la primera enmienda de la Constitución Federal. Asimismo, declinó entrar a considerar su impugnación a base de la Cláusula de Comercio en su estado durmiente por no haberse presentado dicho cuestionamiento oportu-namente ante el foro primario y por existir alternativas dispositivas del caso. Tampoco encontró justificación legal para impedir el ingreso de los dineros recaudados al am-paro de la Ley Núm. 95 a un fondo creado en virtud de la Ley Núm. 238-1996 (5 L.P.R.A. sees. 3051-3061) (Ley Núm. 238). Por último, dispuso que la deuda según decre-tada por el TPI era correcta, por lo que Northwestern es-taba obligada a satisfacer el monto total reclamado por el Departamento de Hacienda.
Inconforme, la parte peticionaria acude ante nos seña-lando los errores siguientes([1])
PRIMER ERROR: Erró el Honorable Tribunal de Apelaciones al determinar que la intención legislativa de la derogada Ley 95, según implantada, no era promocionar la carne de res del país para contrarrestar el efecto negativo ocasionado por las importaciones de carne a Puerto Rico. El tribunal basó su de-terminación en el texto escrito de la ley núm. 95; no en su historial legislativo ni en su aplicación.
TERCER ERROR: Erró el honorable Tribunal de Apelaciones al negarse a considerar que el pago de la aportación ordenada por el tribunal de primera instancia viola la cláusula de co-mercio interestatal de la constitución de los Estados Unidos en su “estado durmiente” [“dormant commerce clause”]. Peti-ción de certiorari, págs. 5-6.
Evaluado el recurso, acordamos expedir. Contando con *50 el beneficio de la comparecencia de ambas partes, procede-mos a resolver sin trámite ulterior.
I — I I — i
En su escrito, la parte peticionaria plantea que la inter-pretación dada por el Tribunal de Apelaciones a la Ley Núm. 95 resulta contraria a su historial legislativo. En apoyo a su postura, Northwestern sostiene que la Ley Núm. 95 es inconstitucional al utilizarse dineros del Fondo para la promoción exclusiva de la industria pecuaria local, contrario a los intereses de los importadores de carne de res, y menoscabando de este modo sus garantías constitu-cionales a la libre asociación y expresión. Argumenta tam-bién que la aportación preceptuada por dicha disposición estatutaria contraviene la Cláusula de Comercio de la Constitución Federal en su estado durmiente. Por último, impugna la validez de la Ley Núm. 238 en tanto y en cuanto requiere que los dineros previamente aportados por los importadores de carne conforme a la Ley Núm. 95 sean asignados a un fondo constituido por operación del estatuto promulgado.
HH I — I l-H

Ley Núm. 95 y Ley Núm. 238

A. Ley Núm. 95
1. Oficina de la Reglamentación
La Ley Núm. 95, conocida como Ley para Crear la Oficina de la Reglamentación y Promoción de la Industria de la Carne de Res, fue aprobada el 29 de noviembre de 1992 y estuvo en vigor hasta el 31 de diciembre de 1996. En términos generales, las funciones encomendadas a la *51 entidad creada iban dirigidas a “poner en vigor programas y medidas orientadas a propiciar el desarrollo de una in-dustria ganadera, próspera, así como resolver diferentes situaciones o problemas relacionados con la producción, promoción, distribución y venta de la carne de res”. Art. 3 de la Ley Núm. 95 (5 L.P.R.A. see. 3002). Con el objetivo de asegurar el “desarrollo y fortalecimiento de la industria de la carne de res en Puerto Rico”, se delegó en la Oficina de la Reglamentación y Promoción de la Industria de la Carne de Res (Oficina de la Reglamentación) las encomiendas si-guientes:
(1) Promover la producción y consumo de carne de res, así como estimular y fortalecer el establecimiento de nuevas uni-dades de producción a ser administradas individualmente o mediante cooperativa, sociedades, corporaciones o grupo de personas.
(2) Promover el mercadeo ordenado tanto de la carne de res producida localmente así como la importada.
(3) Ofrecer a los productores, así como a los importadores de carne de res los servicios de asesoramiento técnico en las áreas de producción, venta, mercadeo, importación y en las prácticas de administración de unidades productoras. Art. 4 de la Ley Núm. 95 (5 L.P.R.A. see. 3003).
Del propio texto del estatuto se deduce su propósito dual de beneficiar tanto la industria local como los intereses de los importadores. Ello se consigna al (1) procurar atender las necesidades de los productores locales, (2) aumentar las ventas a través de un mercadeo sistematizado, a la vez de (3) proveer asesoramiento técnico. Estas dos últimas enco-miendas sirven de provecho igualmente a los importa-dores.
Conforme al esquema estatutario, la Oficina de la Reglamentación quedó a cargo de un Administrador nombrado por el Secretario de Agricultura. Art. 5 de la Ley Núm. 95 (5 L.RR.A. see. 3004). Entre sus funciones se destacan: promover iniciativas dirigidas al consumidor; procu- *52 rar una mayor participación de los productores e importa-dores en las iniciativas gubernamentales atinentes a la producción y mercadeo; recopilar y publicar información pertinente y estadísticas para la evaluación de la política pública e investigar las transacciones y relaciones comer-ciales de los diversos componentes de la industria local, así como los importadores. Art. 6 de la Ley Núm. 95 (5 L.P.R.A. see. 3005).
2. Fondo para el Fomento de la Industria de la Carne de Res
Con el propósito de adelantar el cumplimiento de los objetivos de propulsar el mejoramiento de este renglón de la economía, la Ley Núm. 95 conjuntamente decretó la creación del Fondo. Según estatuido, el presupuesto del Fondo provendría de dineros aportados tanto por los productores como los importadores de carne conforme a la fórmula siguiente: (1) cuatro dólares con catorce centavos ($4.14) por cada animal sacrificado en matadero; (2) un centavo (1$) por libra de carne de res importada y (3) un dólar ($1) por cada ternero sacrificado en matadero. Art. 9 de la Ley Núm. 95 (5 L.P.R.A. see. 3008).
Se facultó al Secretario de Hacienda a cobrar las apor-taciones establecidas por ley sobre la carne de res importada. Art. 11 de la Ley Núm. 95 (5 L.P.R.A. see. 3010).
El 10% de las cantidades recaudadas fueron destinadas a la Oficina de la Reglamentación para cubrir sus gastos administrativos y operacionales. Art. 4 de la Ley Núm. 95, supra. Por otra parte, se dispuso que los dineros allegados debían de ser utilizados “para la promoción de la produc-ción, venta, elaboración y consumo de la carne de res, y toda otra gestión necesaria para el progreso de la industria de la carne de res”. Art. 9 de la Ley Núm. 95, supra.
*53 La administración del Fondo recayó sobre una Junta Administrativa (Junta Administrativa) constituida por el Administrador, en calidad de miembro ex officio, dos repre-sentantes de los importadores y tres de los productores, así como un representante del interés público. Una vez consti-tuida dicha Junta Administrativa, ésta nombraría su Presidente. Art. 10 de la Ley Núm. 95 (5 L.P.R.A. see. 3009).
B. Ley Núm. 238
1. Oficina de Ordenamiento de las Industrias Agrope-cuarias de Puerto Rico
Aproximadamente cuatro años más tarde,([2]) en virtud de la Ley Núm. 238, conocida como Ley para el Ordenamiento de las Industrias Agropecuarias de Puerto Rico, se derogaron todas aquellas disposiciones de la Ley Núm. 95 que se hallaran en conflicto con el nuevo estatuto. La Ley Núm. 238 dispuso para la creación de la Oficina de Ordenamiento de las Industrias Agropecuarias de Puerto Rico, adscrita al Departamento de Agricultura. Art. 3 de la Ley Núm. 238 (5 L.P.R.A. see. 3052).
Dirigida a promover el desarrollo de las industrias agro-pecuarias en la Isla, con particular énfasis en el mercadeo de sus productos, la Ley Núm. 238 cambió el enfoque que perseguía la Ley Núm. 95. El nuevo estatuto se circunscri-bió a atender la gestión empresarial local en el sector agro-pecuario, dejando fuera de su ámbito el quehacer comercial de los importadores de carne de res. Asimismo, organizó su esfera de poder aglutinando al amparo de su competencia diversas industrias relacionadas a este renglón de la eco-nomía, entre ellas, la Oficina de Reglamentación de la In-dustria Lechera, la Oficina para la Promoción y Reglamen- *54 tación de la Agroindustria del Caballo de Paso Fino de Puerto Rico, la Oficina de la Reglamentación y Promoción de la Carne de Res y el Consejo de la Industria Pesquera y Acuicultura.
Se autorizó al Secretario de Agricultura a transferir los programas antes mencionados, todos relacionados a la In-dustria Agropecuaria de Puerto Rico, al amparo de la ju-risdicción de la Oficina de Ordenamiento de la Industria Agropecuaria. Para hacer viable el proyecto de desarrollo económico establecido en la ley, cada una de las industrias que quedara adscrita a dicha oficina crearía un fondo diri-gido a promover la producción y comercialización de sus productos, encomienda que se lograría mediante la trans-ferencia de sus correspondientes asignaciones presupues-tarias a ese nuevo fondo. Arts. 7 y 12 de la Ley Núm. 238 (5 L.P.R.A. sees. 3056 y 3061). La Junta Administrativa del Fondo constituida en virtud de la Ley Núm. 95 pasaría a ser el cuerpo directivo del programa equivalente al amparo de la Oficina de Ordenamiento de la Industria Agropecua-ria, una vez ésta fuese reestructurada conforme a las dis-posiciones de la Ley Núm. 238. Art. 2 de la Ley Núm. 238 (5 L.P.R.A. see. 3051 n.).

<

Como fundamento para dejar sin efecto la determina-ción recurrida, Northwestern aduce un total de cuatro errores alegadamente cometidos por el foro apelativo intermedio. Por las razones que procedemos a enunciar más adelante, atenderemos únicamente el primer y el ter-cer error que transcribiéramos anteriormente, según esbo-zados por Northwestern en su alegato.([3]) Debido a que am- *55 bos señalamientos están íntimamente relacionados entre sí, los discutiremos de manera integrada.
La peticionaria cuestionó por primera vez la validez de la Ley Núm. 95 a la luz de los principios rectores que ema-nan de la Cláusula de Comercio de la Constitución Federal durante el trámite apelativo. No se presentó este argu-mento como parte de los procedimientos en instancia, por lo que el Tribunal de Apelaciones rehusó considerar sus méritos.([4])
Aunque como regla general un tribunal apelativo no debe entrar a resolver cuestiones no planteadas a nivel de instancia, repetidamente hemos reafirmado el principio rector de que en miras de impartir justicia, un “tribunal apelativo tiene la facultad inherente de considerar y resolver errores patentes que surjan de un recurso aun cuando éstos no hayan sido presentados por las partes”. S.L.G. Flores-Jiménez v. Colberg, 173 D.P.R. 843, 851 (2008), citando a. Hernández v. Espinosa, 145 D.P.R. 248, 264 (1998). Véase, además, Hons. Castro, Cabán v. Depto. de Justicia, 153 D.P.R. 302, 312 (2001).
Ya desde Piovanetti v. Vivaldi, 80 D.P.R. 108, 121-122 (1957), reconocimos que la norma de rechazar cuestiones no planteadas o resueltas por los tribunales inferiores no es un dogma inquebrantable. Véanse, además: Granados v. Rodríguez Estrada I, 124 D.P.R. 1, 46-47 (1989); Sánchez v. Eastern Air Lines, Inc., 114 D.P.R. 691, 694-695 (1983); Santiago Cruz v. Hernández Andino, 91 D.P.R. 709, 711 (1965).
Según hemos explicado, dicha máxima restrictiva debe aplicarse con gran cautela, apartándose de los rigores e inflexibilidad de una regla automática. Santiago Cruz v. *56 Hernández Andino, supra, pág. 711; Piovanetti v. Vivaldi, supra, pág. 122.
De ahí que si la cuestión planteada por primera vez en apela-ción no suscita ninguna controversia de hecho, y por el contra-rio, sólo envuelve una cuestión de derecho cuya solución basta para dictar en apelación un fallo final, no podríamos negarnos a considerarla sin faltar a nuestro deber de impartir justicia y de hallar en cada litigio la verdad. Piovanetti v. Vivaldi, supra, pág. 122.
La controversia suscitada en este recurso gira en torno a un asunto de gran trascendencia para nuestro ordena-miento, lo que nos induce a manifestarnos finalmente de manera directa y contundente sobre la Cláusula de Comer-cio y sus efectos en nuestra jurisdicción. Consideramos apropiado este caso para dilucidar dicha problemática, ya que no se encuentran presentes hechos en controversia re-lacionados con este planteamiento en particular, lo que li-mita nuestra labor a una de estricto derecho.
V

Cláusula de Comercio en su “estado durmiente”

Previo a dilucidar el asunto medular de si aplica a Puerto Rico la Cláusula de Comercio de la Constitución Federal en su versión durmiente o negativa, juzgamos per-tinente precisar en qué consiste.
La potestad del Congreso de Estados Unidos (Congreso) para regular el comercio entre los estados, así como con naciones extranjeras, aparece conferida taxativamente en el Art. I, Sec. 8 de la Constitución Federal, L.P.R.A., Tomo l.([5]) Dicha disposición constitucional, cono- *57 cida comúnmente como la Cláusula de Comercio, ha ser-vido a través de los años como fuente amplia del poder reglamentario de la rama legislativa federal. L.H. Tribe, American Constitutional Law, 3ra ed., Nueva York, Foundation Press, 2000, Vol. 1, págs. 807-808; E. Chemerinsky, Constitutional Law, Principles and Policies, 4ta ed., Nueva York, Aspen Publishers, 2010, págs. 238-239.
A pesar de que la Constitución Federal no establece res-tricción alguna a la injerencia de los estados en el comercio interestatal, hace ya más de un siglo que el Tribunal Supremo de Estados Unidos (Tribunal Supremo federal) de-cretó que, en vista de la facultad congresional específica-mente adscrita, existen unas prohibiciones implícitas al poder de los estados en este renglón. Cooley v. Board of Wardens, 53 U.S. 299 (1851).
Esta limitación regulatoria se ha denominado como el aspecto “durmiente” o “negativo” de la Cláusula de Comer-cio y surge como contraparte al poder que le ha sido confe-rido expresamente al Congreso a través de dicho precepto constitucional. Department of Revenue of Ky. v. Davis, 553 U.S. 328, 337 — 338 (2008); United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U.S. 330, 338 (2007); American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, 545 U.S. 429, 433 (2005).
Por su parte, James Madison, considerado como el padre de la Constitución Federal, consideró el aspecto nega-tivo de la Cláusula de Comercio como el más importante. A estos efectos, indicó que la Cláusula de Comercio se re-dactó como medida para atender el abuso de poder ejerci-tado por los estados al imponer cargas tarifarias sobre los productos provenientes de los otros estados. Explicó que, más que concederle autoridad al Gobierno central, tenía como fin prevenir la injusticia entre los propios estados. West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 193 esc. 9 (1994).
*58 A. A través de los años el Tribunal Supremo federal ha utilizado diversas teorías para apoyar el desarrollo de la doctrina de la Cláusula de Comercio en su aspecto durmiente.
Inicialmente, ésta surge como medida para atender los efectos económicos adversos en el colectivo de la nación norteamericana sobrevenidos como resultado de los inten-tos de proteccionismo económico de los estados individuales. Es decir, pretendía desalentar aquellas dispo-siciones reglamentarias dirigidas a beneficiar los intereses económicos dentro del estado que imponían cargas o res-tricciones a los competidores de fuera de sus lindes geográficos. A tales efectos, se destaca la importancia de operar conjuntamente como una nación, a la vez que se le reconoce cierto grado de autonomía fiscal a sus componentes. En otras palabras, en términos económicos los Estados Unidos son una sola nación. “[The Constitution] was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division”. Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 523 (1935). Véanse, además: American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, supra, pág. 433; West Lynn Creamery, Inc. v. Healy, supra, pág. 206. “This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separate economic units”. H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 537-538 (1949).
Los efectos perjudiciales que la doctrina quiere evitar han sido denominados por el Tribunal Supremo federal como “aislamiento” o “balcanización”, y las medidas impug-nadas han sido analizadas a la luz de la necesidad apre-miante de alcanzar el beneficio común sobre el de cada *59 estado individual. “The point is to effectuate the Framers’ purpose to prevent a State from retreating into the economic isolation that had plagued relations among the Colonies and later among the States under the Articles of Confederation”. (Citas, comillas y corchetes omitidos). Department of Revenue of Ky. v. Davis, supra, pág. 338. Véase, además, West Lynn Creamery, Inc. v. Healy, supra, pág. 202.
This mandate reflects a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkani-zation that had plagued relations among the Colonies and later among the States under the Articles of Confederation. (Cita, comillas y corchetes omitidos). Granholm v. Heald, 544 U.S. 460, 472 (2005). Véanse, además: Department of Revenue ofKy. v. Davis, supra, págs. 337-338; Wardair Canada, Inc. v. Florida Dept. of Revenue, 477 U.S. 1, 7 (1986).
Parte de lo que se persigue al proscribir el proteccio-nismo es evitar represalias de los otros estados generadas en respuesta al trato desigual brindado a sus residentes por un estado hermano, lo cual socavaría los designios del esquema constitucional federal. “The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent”. C & A Carbone, Inc. v. Clarkstown, 511 U.S. 383, 390 (1994).
Igualmente, se protege la libertad de movimiento de los bienes entre los estados y los demás componentes de la Nación Americana salvaguardando el libre acceso y compe-tencia de los mercados constituidos por estos.
Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, *60 and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality. Ii.P. Hood & Sons, Inc. v. Du Mond, supra, pág. 539; West Lynn Creamery, Inc. v. Healy, supra, págs. 206-207.
Por otro lado, se le ha permitido a los estados imponer medidas no discriminatorias siempre y cuando éstas sean aplicadas de forma neutral aunque acarreen algún efecto adverso sobre el comercio interestatal. Ello, en parte, por entender que los intereses afectados dentro del estado ope-ran como salvaguarda contra el posible abuso legislativo ejercitado hacia los residentes de otros estados. West Lynn Creamery, Inc. v. Healy, supra, pág. 200.
Cabe notar que las restricciones concomitantes a la Cláusula de Comercio no son de aplicación cuando es el propio estado, en calidad de partícipe en el mercado y no como ente regulador, quien ejercita esta facultad a favor de sus propios ciudadanos. Al amparo de su poder de razón de estado (“police power”), los gobiernos tienen la responsabilidad de proteger la salud, la seguridad y el bienestar de sus ciudadanos. Es por ello que, tradicionalmente, gozan de gran discreción para legislar sobre asuntos relacionados con estas áreas de interés.
[A]n exception covers States that go beyond regulation and themselves participate in the market so as to exercise the right to favor their own citizens over others. This market-participant exception reflects a basic distinction between States as market participants and as market regulators. ... When a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause. Department of Revenue of Ky. v. Davis, supra, pág. 339.
*61 VI
A. De entrada debemos resolver si la Cláusula de Co-mercio en su estado durmiente aplica a Puerto Rico. Como sabemos, Puerto Rico pasó a formar parte del esquema constitucional de Estados Unidos como resultado de la Guerra Hispanoamericana. Mediante el Tratado de París de 1898, la soberanía de Puerto Rico fue cedida a los Esta-dos Unidos —Art. II, Tratado de París, L.P.R.A., Tomo 1— y se estableció que los derechos de los habitantes de la Isla serían definidos por el Congreso. Id., Art. IX. De suerte que desde inicios de nuestra relación con Estados Unidos, la manera en la cual la Constitución Federal aplicaría a Puerto Rico fue objeto de intensos debates. Véase J.J. Ál-varez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, págs. 409-410.
A final de cuentas, le tocó al Tribunal Supremo federal resolver de qué manera aplicaría la Constitución Federal a los nuevos territorios adquiridos a finales del Siglo XIX. Mediante los llamados “Casos Insulares”, el Tribunal Supremo federal decidió que la Constitución no aplicaba en su totalidad ex proprio vigore a todos los territorios. Downes v. Bidwell, 182 U.S. 244 (1901). Sólo aquellos territo-rios que hubieran sido “incorporados” a Estados Unidos es-tarían sujetos en su totalidad a las disposiciones de la Constitución Federal. En el caso de Puerto Rico, mediante opinión dividida, se decidió que este era un territorio no incorporado al cual sólo le aplicarían las cláusulas de na-turaleza fundamental de la Constitución Federal. íd., pág. 291.
Así las cosas, el Tribunal Supremo federal ha ido paula-tinamente estableciendo cuáles cláusulas de la Constitu-ción Federal son de naturaleza fundamental y, por ende, de aplicación a Puerto Rico. Así, se ha resuelto que aplica a la *62 Isla la protección a la libertad de expresión de la Primera Enmienda, Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. 328 (1986), la protección contra registros y allanamientos irrazonables, Torres v. Com. Puerto Rico, 442 U.S. 465 (1979), la garantía a un debido proceso de ley, Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663 (1974), la garantía de igual protección de las leyes, Examining Bd. v. Flores de Otero, 426 U.S. 572 (1976), y la cláusula de suspensión del hábeas corpus, Boumediene v. Bush, 553 U.S. 723 (2008).
En cuanto a la Cláusula de Comercio Interestatal, ini-cialmente rechazamos su injerencia en nuestro ordena-miento por entender que la relación de Puerto Rico con Estados Unidos estaba cimentada en la Cláusula Territorial de la Constitución Federal. ([6]) Siguiendo esta línea de pensamiento, concluimos que “contrario al efecto que tiene [la Cláusula de Comercio] sobre el poder de las legislaturas estatales, [dicha disposición] no restringe el poder de la legislatura insular ...”. Ballester Hnos. v. Tribunal de Contribuciones, 66 D.P.R. 560, 566 — 567 (1946).
Posteriormente, en R.C.A. v. Gobierno de la Capital, 91 D.P.R. 416 (1964), sostuvimos que la Cláusula de Comercio no aplicaba a Puerto Rico ex proprio vigore. En ese mo-mento, a mediados del siglo pasado, apuntamos que luego de la cesión de Puerto Rico a Estados Unidos mediante el Tratado de París, a diferencia de otras comunidades, no se hicieron extensivas en su totalidad las disposiciones cons-titucionales a la Isla. Mencionamos también que expresa-mente se excluyeron de aplicación a Puerto Rico la Ley sobre Comercio Interestatal, así como sus enmiendas, al igual que la Ley para Regular el Comercio, aprobada el 4 *63 de febrero de 1887 y las leyes enmendatorias de la misma.([7]) Añadimos que tampoco se hicieron extensivas las leyes de rentas internas federales.([8])
Subsiguientemente, aplicamos lo señalado en R.C.A. v. Gobierno de la Capital, supra, en otra jurisprudencia. Véase South P.R. Sugar Corp. v. Com. Servicio Pub., 93 D.P.R. 12,15-16 (1966) (donde resolvimos que de todos mo-dos la medida impugnada no constituía “una carga irrazo-nable, discriminatoria u onerosa sobre el comercio interes-tatal Mientras, en M. & B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987), sostuvimos la validez de la reglamentación de cierta leche importada conforme a la normativa federal sobre la Cláusula de Comercio, ha-ciendo la observación de que dicho resultado hacía innece-sario resolver su aplicabilidad a Puerto Rico.
Sin embargo, nuestra decisión en R.C.A. v. Gobierno de la Capital, supra, comenzó a cuestionarse posteriormente por varios miembros de este Tribunal. Así, por ejemplo, en E.L.A. v. Supermercados Amigo, 170 D.P.R. 459, 460-470 (2007) (Sentencia), el Juez Asociado Señor Efraín Rivera Pérez emitió una opinión disidente en la cual cuestionó por qué el Tribunal se negó en esa ocasión a revisar la decisión de R.C.A. v. Gobierno de la Capital, supra. Id., págs. 460-461. Además, expresó el Juez Asociado Señor Rivera Pérez que, a su entender, la Cláusula de Comercio en su estado durmiente se extendía a Puerto Rico a través de la Ley de Relaciones Federales. Id., pág. 467.
Posteriormente, el Juez Asociado Señor Francisco Rebo-llo López se insertó al debate sobre la validez de nuestra decisión en R.C.A. v. Gobierno de la Capital, supra. En su opinión de conformidad en Asoc. Importadores de Cerveza *64 v. E.L.A., 171 D.P.R. 140, 143-172 (2007) (Sentencia), ex-presó el Juez Asociado Señor Rebollo López que
... dadas las circunstancias particulares de nuestra relación con Estados Unidos, los argumentos a favor de la aplicación a Puerto Rico de la cláusula de comercio, en su estado dur-miente, son más persuasivos que los argumentos en contra.
[Ejntendemos que la doctrina relativa al estado durmiente de la cláusula de comercio de la Constitución de Estados Uni-dos aplica al Estado Libre Asociado de Puerto Rico, según lo ha desglosado el Tribunal Supremo federal. (Enfasis en original). íd., págs. 159 y 161.
B. A nivel federal, la discusión sobre este tema, aun-que abundante, es diametralmente opuesta a lo que deci-dimos en R.C.A. v. Gobierno de la Capital, supra.
Inicialmente, en Lugo v. Suazo, 59 F.2d 386, 390 (1er Cir. 1932), se dictaminó sin discusión alguna que la Cláusula de Comercio no era extensiva a Puerto Rico. Luego, en Sancho v. Bacardi Corporation of America, 109 F.2d 57, 62-63 (1er Cir. 1940), se indicó que dicha disposición cons-titucional no aplicaba, ya que Puerto Rico no era un estado de la Unión, sino que la facultad legislativa sobre la Isla residía en la Cláusula Territorial. Finalmente, en Buscaglia v. Ballester, 162 F.2d 805, 806-807 (1er Cir. 1947), se rechazó la aplicación a Puerto Rico de la Cláusula de Comercio tanto en su versión activa como durmiente por no ser éste un estado, sino un territorio organizado no incor-porado de Estados Unidos.
No obstante, en Trailer Marine Transport Corp. v. Rivera Vázquez, 977 F.2d 1 (1er Cir. 1992), se revocó el dictamen de Buscaglia v. Ballester, supra. El Tribunal de Ape-laciones federal para el Primer Circuito determinó que las relaciones constitucionales entre Estados Unidos y Puerto Rico habían evolucionado al punto de asemejarse a un es-tado con su propio sistema republicano de gobierno, lo que lo colocaba dentro del ámbito de la Cláusula de Comercio durmiente.
*65 We think that the force of the reasoning in Buscaglia has been sapped by events since that decision. However the matter may have appeared in 1947, certainly since 1952 Puerto Rico has had sufficient effective autonomy to classify it as something more than the mere agent of Congress and thus bring it within the dormant Commerce Clause doctrine. Trailer Marine Transport Corp. v. Rivera Vázquez, supra, pág. 9.
El tribunal indicó que el propósito de la legislación federal del 1950 y 1952 atinente a Puerto Rico fue conceder a la Isla un grado de autonomía e independencia normal-mente asociada con los estados de la Unión. Trailer Marine Transport Corp. v. Rivera Vázquez, supra, págs. 8-9. Asimismo, razonó el referido foro que los propósitos que alien-tan la doctrina de la Cláusula de Comercio durmiente, tales como la integración económica y evitar la interferencia con el flujo del comercio nacional, aplican igualmente a la relación de Puerto Rico con Estados Unidos.
La doctrina expuesta en Trailer Marine Transport Corp. v. Rivera Vázquez, supra, sigue vigente y es aplicada con-secuentemente por los tribunales federales. Véanse: Antilles Cement Corp. v. Acevedo Vilá, 408 F.3d 41 (1er Cir. 2005); Walgreen Co. v. Rullán, 405 F.3d 50 (1er Cir. 2005); Starlight Sugar, Inc. v. Soto, 253 F.3d 137 (1er Cir. 2001).
C. La discusión sobre este tema se ha extendido entre exmiembros de esta Curia y profesores de derecho quienes, a pesar de utilizar teorías diferentes, en su mayoría coin-ciden en que existen limitaciones al poder reglamentario de Puerto Rico en materia del comercio interestatal. Opina el otrora Juez Asociado Señor Raúl Serrano Geyls:
En lo que toca a Puerto Rico, aunque ha habido intensos debates sobre la aplicación de la Cláusula de Comercio a nues-tro país ... no hay duda de que, independientemente de las justificaciones teóricas, las normas establecidas por el Tribunal Supremo federal para los estados rigen en Puerto Rico por razón de que el Congreso desde 1900 incluyó a la Isla en el sistema de comercio estadounidense. R. Serrano Geyls, Dere- *66 cho constitucional de Estados Unidos y Puerto Rico, [San Juan], Colegio de Abogados de Puerto Rico — Instituto de Edu-cación Práctica, 1986, Vol. 1, pág. 341.
En su libro de reciente publicación, el Prof. José Julián Álvarez González cuestiona que Puerto Rico tenga la capa-cidad de promulgar reglamentaciones vedadas a los esta-dos, lo que equivaldría a reconocerle más autonomía que la que éstos poseen. A esos efectos ha expresado “[q]ue la ley federal de comercio interestatal no aplique a Puerto Rico, por voluntad del Congreso, no significa necesariamente que tampoco apliquen las limitaciones que surgen de la propia cláusula de comercio”. (Enfasis en original). Álvarez González, op. cit., pág. 574.
Asimismo, el profesor Álvarez González también ha in-dicado lo siguiente:
La doctrina de incorporación territorial se inventó para permi-tir al gobierno federal tratar con Puerto Rico libre de muchas de las ataduras que la Constitución federal impone a ese gobierno. De ello no se infiere —ni lógicamente ni de forma alguna— que esa doctrina sirva o pueda servir para liberar al gobierno de Puerto Rico frente al poder federal. (Enfasis en original). Álvarez González, op. cit., pág. 575.
Por su parte, el Prof. David M. Helfeld coincide con la premisa de que no se le puede permitir a Puerto Rico in-terferir con el comercio interestatal o profesar el aisla-miento económico cuando dicha conducta le está prohibida a los estados. Al mismo tiempo, hace mención de las limi-taciones implantadas por la See. 3 de la Ley de Relaciones Federales que prohíben tanto la imposición de tarifas a las exportaciones a Estados Unidos como impuestos discrimi-natorios a artículos importados de los Estados Unidos o el extranjero frente a aquellos producidos o manufacturados en la Isla. D.M. Helfeld, How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?, 39 Rev. Jur. U.P.R. 169, 190 (1970).
*67 D. No cabe duda que a través de los años la relación de Puerto Rico y Estados Unidos ha ido evolucionando y se ha fortalecido de diversas maneras. En múltiples ocasiones, el Tribunal Supremo federal ha expresado que Puerto Rico debe ser tratado como si fuera un estado para propósitos constitucionales o de aplicación estatutaria.
Así, por ejemplo, el Tribunal expresó en Rodríguez v. Popular Democratic Party, 457 U.S. 1, 8 (1982), que Puerto Rico, al igual que los estados federados, puede decidir la manera en que llena vacantes en las cámaras legislativas. Por su parte, en Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592 (1982), se decidió que Puerto Rico puede ejercer su poder de parens patrie para asegurar que los beneficios del sistema federal no sean negados a sus ciudadanos como si fuera un estado.
A base de esto, nos parecen acertadas las expresiones de la ex Jueza Asociada del Tribunal Supremo federal Sandra Day O’Connor en United States v. Laboy-Torres, 553 F.3d 715 (3er Cir. 2009):
It is thus not surprising that “although Puerto Rico is not a state in the federal Union, ‘it ... seems to have become a State within a common and accepted meaning of the word.’” Consistent with this common and accepted understanding, Congress frequently uses the term “State” to refer also to Puerto Rico. ... More significantly, when Congress fails explicitly to refer to Puerto Rico, courts must nonetheless inquire whether it intended to do so. ... Conducting this inquiry, courts routinely conclude that Congress intended to include Puerto Rico even when a statute is silent^ on that front. ... (Citas internas omitidas y énfasis suplido). íd., pág. 721.
Amparados en que Puerto Rico es considerado por la jurisprudencia federal en la mayoría de las ocasiones como si fuese un estado de la Unión federal, pasamos a conside-rar el asunto medular de esta Opinión: ¿Aplica la Cláusula de Comercio en su estado durmiente a Puerto Rico?
Como ya discutimos, la Cláusula de Comercio es *68 una de las más eminentes delegaciones de poder que se hizo al Congreso de Estados Unidos. Su vertiente negativa o durmiente representa la herramienta principal del es-quema constitucional para prohibir la balcanización entre los componentes de la federación. Por ende, y ante la cada vez mayor integración de Puerto Rico al sistema federal, la justificación para la aplicación de esa Cláusula a la Isla es sencilla.
Si en términos prácticos Puerto Rico se asemeja a un estado, le deben aplicar igualmente las limitaciones que recaen sobre estos en virtud de la Cláusula de Comercio. Resultaría inconcebible la posibilidad de que exista una jurisdicción que sea considerada como un estado en Esta-dos Unidos que no esté sujeta a la Cláusula que representa la herramienta de integración económica y nacional más importante de la Constitución Federal. Los efectos desfa-vorables al federalismo que la Cláusula de Comercio en su estado durmiente está dirigida a evitar también sirven de fundamento para la implementación del aspecto durmiente o negativo de la Cláusula de Comercio a Puerto Rico.
Aunque nuestra Constitución provee para la imposición y el cobro de contribuciones por parte del Estado, según sea dispuesto por la Asamblea Legislativa,([9]) y dicha facultad se ha interpretado como una amplia y abarcadora (Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548 (2001); Continental Ins. Co. v. Srio. de Hacienda, 154 D.P.R. 146 (2001)), su capacidad tributaria no es ilimitada. El desempeño de su papel como ente fiscal debe ser ejercitado de manera cónsona con pautas de naturaleza constitucional, así como aquellas otras restricciones que le apliquen. Sobre este particular, la Ley de Relaciones Federales dispone en su Art. 3 que no se hará distinción entre *69 los artículos importados de Estados Unidos y aquellos si-milares producidos o manufacturados en Puerto Rico. Art. 3 de la Ley de Relaciones Federales, L.P.R.A., Tomo 1, See. 3.
Por otra parte, las enmiendas a nuestra Constitución están circunscritas a que éstas sean “compatible [s] con la resolución decretada por el Congreso de los Estados Uni-dos aprobando [la] Constitución con las disposiciones apli-cables de la Constitución de los Estados Unidos, con la Ley de Relaciones Federales con Puerto Rico y con la Ley Pú-blica 600 ... adoptada con el carácter de un convenio”. Art. VII, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 443.
El propósito de esta condición se expuso de la manera siguiente:
Applicable provisions of the United States Constitution and the Federal Relations Act will have the same effect as the Constitution of the United States has with respect to State constitutions or State laws. United States laws not locally inapplicable will have equal force and effect in Puerto Rico as throughout the States except as otherwise provided in the Federal Relations Act. Any act of the Puerto Rican Legislature in conflict with ... the Constitution of the United States or United States laws not locally inapplicable would be null and void.
Within this framework, the people of Puerto Rico will exercise self-government. As regards local matters, the sphere of action and the methods of government bear a resemblance to that of any State of the Union. Examining Bd. v. Flores de Otero, supra, págs. 593-594 esc. 25.
Podemos colegir, por lo tanto, que el esquema normativo provisto para nuestra relación con Estados Unidos equi-para el alcance de la Constitución Federal y la Ley de Re-laciones Federales en nuestro ordenamiento a la preemi-nencia de la Constitución Federal sobre las constituciones y disposiciones estatutarias de los estados.
Por otro lado, además de la Cláusula de Comercio, queda claro que el Congreso quería prohibir que Puerto *70 Rico discriminara contra artículos importados. Esta volun-tad quedó categóricamente plasmada en el Art. 3 de la Ley de Relaciones Federales. Art. 3 de la Ley de Relaciones Federales, supra. Por ende, aun si sostuviéramos que no aplica ex proprio vigore la Cláusula de Comercio en su es-tado durmiente a Puerto Rico, la propia Ley de Relaciones Federales prohíbe a la Isla discriminar contra artículos im-portados, por lo cual el efecto sería el mismo: la Isla no puede levantar barreras de aislamiento económico al resto de la Nación.
Es por eso que no deben sorprendernos los serios cuestionamientos que se han alegado contra nuestra determinación en R.C.A v. Gobierno de la Capital, supra. Como vimos, en esa ocasión decidimos que la Cláusula de Comercio en su estado durmiente no aplicaba a Puerto Rico, por lo cual la Isla podía poner en vigor medidas económicas que estarían vedadas a los estados. Como muy bien expone el profesor Alvarez González:
[L]a sola enunciación de esa consecuencia demuestra su imposibilidad. Resulta increíble que el Congreso en 1952 haya estado dispuesto a reconocerle a Puerto Rico un poder del que carecen los estados y que es tan contrario a la cada vez mayor integración económica en Estados Unidos. Alvarez González, op. cit., pág. 574.
Coincidimos con las expresiones de éste. El razonamiento de R.C.A v. Gobierno de la Capital, supra, sencillamente no va acorde con la realidad de la relación constitucional de Puerto Rico y Estados Unidos. Dicho caso no tiene espacio en nuestra jurisprudencia y queda hoy revocado.
Conforme a lo anteriormente expuesto, hoy decidimos que las limitaciones inherentes a la Cláusula de Comercio interestatal en su estado durmiente aplican a Puerto Rico “ex proprio vigore”. Por ende, al igual que los estados de la federación, Puerto Rico está constitucionalmente vedado de imponer medidas económicas que afecten negativamente el comercio interestatal.
*71 VII
Una vez resuelto el asunto preliminar de la aplicación de los preceptos que abarca la Cláusula de Comercio en su modalidad durmiente a Puerto Rico, nos toca atender si la legislación impugnada en efecto los contraviene.
Reiteradamente hemos reconocido el principio de que todo estatuto es y se presume constitucional hasta que se determine lo contrario. Aut. Carreteras v. 8,554.741 m/c I, 172 D.P.R. 278, 298 (2007); Rexach v. Ramírez, 162 D.P.R. 130, 148 (2004); Cerame-Vivas v. Srio. de Salud, 99 D.P.R. 45, 51 (1970).
Al ejercer nuestra función judicial de auscultar la vali-dez de un estatuto lo hacemos conscientes de la deferencia exigida al ejercicio del Poder Legislativo según el mandato constitucional, conforme con los roles adscritos a cada una de las ramas gubernamentales según el esquema de sepa-ración de poderes allí prescrito. Se busca, por lo tanto, lo-grar aquellas interpretaciones que sostengan su validez ante los ataques por alegada deficiencia constitucional. Aut. Carreteras v. 8,554.741 m/c I, supra, pág. 298; Rexach v. Ramírez, supra, pág. 149; Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1990).
Una ley puede ser declarada inconstitucional tanto de su faz como en su aplicación. Aut. Carreteras v. 8,554.741 miel, supra, pág. 298; Rexach v. Ramírez, supra, pág. 148; Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, 144 D.P.R. 1, 22 (1997).
Como parte del proceso de evaluar la constitucionalidad de una ley de su faz, es menester considerar si de su propio texto surge el vicio que la torna inconstitucional. Por otra parte, para determinar si el estatuto vulnera derechos constitucionales en su aplicación es preciso analizar el con-texto en el cual la medida impugnada ha sido empleada *72 para determinar si ha tenido el efecto de infringir alguna disposición constitucional. Rexach v. Ramírez, supra, pág. 148; Asoc. Ctrl. Ace. C. Maracaibo v. Cardona, supra, pág. 23.
A pesar del tiempo transcurrido desde su génesis, la doctrina de la Cláusula de Comercio durmiente no resulta fácil de aplicar. Así lo reconoció el Juez Asociado del Tribunal Supremo federal Clarence Thomas quien, luego de detallar los fundamentos judiciales utilizados a través de los años para validarla, consignó la siguiente observación: “[D] espite more than 100 years of negative Commerce Clause doctrine, there is no principled way to decide this case under current law”. United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 353, opinión concurrente del Juez Thomas.
Igualmente, por voz del Tribunal Supremo federal se ha descrito la jurisprudencia en esta área como “terreno no firme” donde las decisiones tomadas equivalen a reacciones judiciales a situaciones particulares. “[W]e have described our own decisions in this area as a ‘quagmire’ of judicial responses to specific state tax measures ...”. Amer. Trucking Assns. v. Scheiner, 483 U.S. 266, 280 (1987).
La fluctuación de las bases sobre las cuales se asienta la doctrina desarrollada en torno a la Cláusula de Comercio en su aspecto negativo ha ocasionado incertidumbre. A la vez, ha engendrado detractores dentro del seno del propio Tribunal Supremo federal. A estos efectos, ha sido severa-mente criticada por varios de sus miembros por éstos en-tender que según la misma ha sido expandida se les coloca en una posición injustificada de intervención judicial.([10])
*73 Queda claro, sin embargo, que el análisis según los parámetros de la Cláusula de Comercio en su estado durmiente rechaza la formalidad y, en su lugar, exige un examen individualizado caso a caso con especial atención a los propósitos y efectos del precepto en cuestión. West Lynn Creamery, Inc. v. Healy, supra, pág. 201.
Las leyes pueden resultar discriminatorias de su faz, por el propósito que persiguen o por su efecto en el comercio interestatal. ([11]) Cuando un estatuto claramente discrimina de su faz contra el comercio interestatal o cuando tiene el propósito o efecto práctico de favorecer los intereses locales sobre los de fuera del estado, como regla general, se considerará inválido per se y corresponderá al ente regulador defenderlo presentando prueba de que éste sirve un propósito legítimo, el cual no puede ser atendido por medios alternos razonables no discriminatorios.
Under the resulting protocol for dormant Commerce Clause analysis, we ask whether a challenged law discriminates against interstate commerce. A discriminatory law is “virtually per se invalid” and will survive only if it advances a legiti *74 mate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. (Citas y comillas omitidas). Department of Revenue of Ky. v. Davis, supra, pág. 338. Véase, además, Hunt v. Washington State Apple Advertising Comm’n, 432 U.S. 333, 353 (1977).
Por otra parte, cuando la disposición está redactada en términos neutrales y su aplicación no resulta parcializada, se presume lícita. Su legitimidad, a la luz de la Cláusula de Comercio, se determinará en función al balance entre la intrusión que ésta representa al comercio interestatal y los beneficios que genera. En estos casos, corresponde a la parte que la impugna establecer que la interferencia oca-sionada al comercio interestatal es excesiva. Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).
[The Pike test is] reserved for laws directed to legitimate local concerns, with effects upon interstate commerce that are only incidental. Under the Pike test, we will uphold a nondiscriminatory statute ... unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits. (Citas, comillas y corchetes omitidos). United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 346. Véanse, además: American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, supra, pág. 433; Department of Revenue of Ky. v. Davis, supra, pág. 339.
Como primer paso al análisis correspondiente según el aspecto durmiente de la Cláusula de Comercio, debe preguntarse si la reglamentación en controversia discrimina contra el comercio interestatal. Department of Revenue of Ky. v. Davis, supra, pág. 338; United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 338; American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, supra, pág. 433.
Una de las maneras en que se puede interferir con el comercio interestatal es a través de cargas económicas al flujo de las transacciones entre los estados. Con el propó-sito de indagar sobre la legalidad de los impuestos refren- *75 dados por los estados a este tipo de actividad, se ha esta-blecido una serie de criterios que han de servir al tribunal como guía en su gestión interpretativa. Así pues, se consi-derará una medida tributaria válida si cumple con los re-quisitos siguientes: (1) existe un nexo sustancial entre la actividad sujeta a la contribución y el estado que la im-pone; (2) la contribución está distribuida equitativamente; (3) la contribución en cuestión no discrimina contra el co-mercio interestatal, y (4) la contribución está relacionada apropiadamente con los servicios provistos por el estado. Esta doctrina, esbozada inicialmente en Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977), ha sido avalada por el Tribunal Supremo federal en casos donde el planteamiento gira en torno al aspecto durmiente de la Cláusula de Comercio.([12]) American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, supra, pág. 438; Amer. Trucking Assns. v. Scheiner, supra, pág. 277; Wardair Canada, Inc. v. Florida Dept. of Revenue, supra, pág. 8.
En cuanto al caso que nos ocupa, nos vemos precisados a abordar únicamente los aspectos relacionados al tercer cri-terio aludido anteriormente. Es decir, el aspecto de discrimen. Ello es así puesto que el planteamiento según esgrimido por la parte peticionaria en su recurso gira ex-clusivamente en torno al alegado propósito y motivo discri-minatorio de la contribución impugnada.([13])
*76 En el contexto de la Cláusula de Comercio en su acepción negativa se entiende por “discrimen” el trato desigual dispensado a los intereses económicos dentro y fuera del estado beneficiando a los primeros e imponiendo cargas a los últimos. Esta premisa ha sido articulada por el máximo foro federal de diferentes maneras. “In this context ‘discrimination’ simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter”. United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 338. Véase Granholm v. Heald, supra, pág. 472. “[W]hen a law favors in-state business over out-of-state competition, rigorous scrutiny is appropriate because the law is often the product of simple economic protectionism”. (Cita y comillas omitidas). United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 343. “[S]tates may not impose taxes that facially discriminate against interstate business and offer commercial advantage to local enterprises ...”. (Citas, comillas y corchetes omitidos). American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, supra, pág. 433; Granholm v. Heald, supra, pág. 472. “[A] state tax that favors in-state business over out-of-state business for no other reason that the location of its business is prohibited by the Commerce Clause”. Amer. Trucking Assns. v. Scheiner, supra, pág. 286.
Como parte del análisis requerido según los parámetros de la Cláusula de Comercio en su estado durmiente, se examinarán igualmente los efectos prácticos de la medida cuestionada para verificar si éstos resultan discrimina-torios. “The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce”. (Cita y comillas omitidas). West Lynn Creamery, Inc. v. Healy, supra, pág. 201.
*77 Las tarifas protectoras que recaen exclusivamente sobre productos provenientes de otro estado sin que apliquen a mercancías similares oriundas del estado impositor constituyen el ejemplo clásico de una ley discriminatoria contra el comercio interestatal. West Lynn Creamery, Inc. v. Healy, supra, pág. 193. “This ‘negative’ aspect of the Commerce Clause prohibits economic protectionism —that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. ...” (Cita y comillas omitidas). íd., pág. 192. “Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits”. íd., pág. 205. “The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests”. C & A Carbone, Inc. v. Clarkstown, supra, pág. 393.
En American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm’n, supra, se avaló la constitucionalidad de una tarifa que exigía el pago de derechos anuales impuesta a camiones de arrastre operando dentro del estado. El Tribunal Supremo federal concluyó que la actividad en cuestión no vulneraba los cuatro factores enunciados en Complete Auto Transit, Inc. v. Brady, supra. Para llegar a esta con-clusión el máximo foro federal utilizó los axiomas jurispru-denciales empleados para analizar si la reglamentación es-tatal discrimina de su faz, así como en su efecto práctico contra el comercio interestatal.
Por otra parte, en West Lynn Creamery, Inc. v. Healy, supra, se declaró inconstitucional un impuesto a la leche vendida por comerciantes de fuera de Massachusetts a de-tallistas dentro del mencionado estado, el cual luego era distribuido entre los productores de leche locales. Se consi-deró que los pagos requeridos constituían un impuesto que ocasionaba que el precio de la leche producida fuera del *78 estado resultara más caro. Aunque el impuesto aplicaba de igual manera a la leche proveniente de Massachusetts, el alza ocasionada en el precio del producto local se veía re-ducida por los subsidios concedidos únicamente a este sector. Utilizando un enfoque pragmático el Tribunal Supremo federal dictaminó que el esquema establecido por la reglamentación constituía esencialmente una tarifa pro-tectora, la cual tenía tanto el propósito como el efecto de discriminar a favor de los productos estatales.
Asimismo en Amer. Trucking Assns. v. Scheiner, supra, pág. 284, el Tribunal Supremo federal encontró que ciertos impuestos implantados por Pennsylvania sobre vehículos de fuera del estado eran discriminatorios, ya que tenían el efecto práctico de cobrarle un impuesto por milla recorrida a los camiones provenientes de fuera del estado aproxima-damente cinco veces más alto que el asignado a los locales. La opinión subrayó la importancia de indagar las conse-cuencias de la medida en controversia sobre el radio de acción delimitado por la Cláusula de Comercio.
Al estudiar las disposiciones de la Ley Núm. 95 a la luz de los principios rectores de las limitaciones de la Cláusula de Comercio antes reseñadas, podemos concluir que de su faz no se deduce vicio alguno. ([14])
Con el fin de fundamentar su argumento de discrimen, la peticionaria inicialmente alude a los trámites llevados a cabo en la Asamblea Legislativa, los cuales eventualmente culminaron con la aprobación de la Ley Núm. 95. En los mismos surgen comentarios de los legisladores así como documentos en los cuales se menciona la necesidad de le- *79 gislar para proteger la industria de carne local de la ame-naza económica que representan las importaciones.
 No obstante, como paso inicial al ejercicio de her-menéutica nuestro ordenamiento nos dirige al texto de la ley. “Cuando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu”. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Al amparo de este supuesto, el texto constituye la expresión por excelencia de toda la intención legislativa. Así pues, si el mandato legislativo aparece registrado de forma clara e inequívoca, libre de ambigüedad, estamos obligados por sus términos sin necesidad de escudriñar más allá de su letra. S.L.G. Rodríguez-Rivera v. Bahía Park, 180 D.P.R. 340, 355 (2010); Rullán Rivera v. A.E.E., 179 D.P.R. 433, 444 (2010); Claro TV y Junta Regl. Tel. v. OneLink, 179 D.P.R. 177, 209-210 (2010).
Es únicamente en aquellas situaciones en que el esta-tuto se muestra confuso o existen dudas sobre su verda-dero propósito cuando debemos acudir a la intención legis-lativa manifestada a través de su historial legislativo, su exposición de motivos, de los diversos informes de las co-misiones de las cámaras o de los debates celebrados en el hemiciclo. S.L.G. Rodríguez-Rivera v. Bahía Park, supra, págs. 355-356.
Sin embargo, al examinar el historial legislativo debe-mos estar atentos, pues “las leyes han de ser interpretadas a base de lo que la Asamblea Legislativa hizo y no a base de lo que ésta dejó de hacer, ni de la actuación personal de uno de sus miembros”. Elicier v. Sucn. Cautiño, 70 D.P.R. 432, 437 (1949).
Las disposiciones de la Ley Núm. 95, según descritas al inicio de esta Opinión, claramente denotan la paridad del trato conferido a los intereses del componente local y de los importadores. Entre las medidas promulgadas mediante dicha ley, favorecedoras de la industria de la carne independientemente del origen del producto, nota- *80 mos el aumentar su consumo en general así como proveer servicios de asesoramiento técnico. Art. 4 de la Ley Núm. 95 (5 L.P.R.A. see. 3003).
Como parte de las funciones delegadas a la Oficina de la Reglamentación se destaca el promover mayor participa-ción tanto de los productores locales como de los importa-dores para recabar su asistencia en lograr los propósitos estatutarios. Art. 6(b) de la Ley Núm. 95 (5 L.RR.A. see. 3005(b)). De hecho, la Junta Administrativa a cargo de la administración del Fondo estaba compuesta por represen-tantes de ambos grupos. Art. 10 de la Ley Núm. 95 (5 LR.R.A. see. 3009).
Cónsono con lo anterior, igualmente en la Exposición de Motivos de la Ley Núm. 95 se recogen intereses salvaguar-dados en dos renglones paralelos: uno, en base a la salud y, otro, en la economía. Por una parte, se reconoce el valor alimenticio de este producto en la dieta humana, por lo que se busca implantar medidas para hacerlo accesible a un mayor número de personas y de este modo mejorar su nutrición. A la par, se promueve el fortalecimiento de la industria mediante la implantación de sistemas de infor-mación y mercadeo, ambas gestiones dirigidas a ser de uti-lidad tanto a las empresas locales como a las importadoras. A estos efectos, la Exposición de Motivos correspondiente precisó lo siguiente:
Siendo la carne de res alimento básico de alto valor alimen-ticio en la dieta humana, es nuestro deber dirigir todos los esfuerzos que sean necesarios para lograr el fortalecimiento y desarrollo que requiere esta empresa. Se caracteriza la misma al presente, por una desorganización la cual es visible a dife-rentes niveles. Reflejo de lo antes indicado es lo siguiente: la carencia de oficinas centralizadas en la cual se pueda tener accesible información sobre precios y condiciones de venta de la carne de res; ausencia de centros de datos sobre diversos aspectos de la industria; falta de orientación y promoción con-sistente y permanente así como falta de centros de investiga-ción relacionados con la industria de la carne de res.
La permanencia así como la expansión de mercados existen-tes para la carne de res son de vital importancia para el bien- *81 estar de los productores, importadores y otros relacionados con este mercado tan importante para la economía de la Isla. De igual manera es importante que la carne de res sea accesible a un mercado eficiente de manera que podamos asegurar una mejor nutrición a nuestro pueblo.
En consideración a lo aquí expuesto esta Asamblea Legislativa ratifica su intención de promover el bienestar general de esta industria así como también velar porque el interés público quede protegido. (Enfasis suplido). 1992 (Parte 1) Leyes de Puerto Rico 615.
La Exposición de Motivos corrobora, por lo tanto, los designios estatutarios según plasmados en la Ley Núm. 95. Allí se menciona que, aparte de perseguir un fin salu-brista, dicho precepto atendía asuntos de interés de la “in-dustria de la carne” en su acepción más amplia, es decir, de las contingencias relacionadas al producto independiente-mente de su origen.
Resalta, pues, del propio texto de la Ley Núm. 95, que las medidas implantadas palpablemente implicaban tam-bién apoyo a los importadores, quienes a su vez contaban con la presencia de sus representantes en la administra-ción conjunta del Fondo. De la expresión legislativa escrita no se deduce el proteccionismo que intima Northwestern.
A base de lo anterior, resolvemos que el mandato legis-lativo aparece escrito de forma clara e inequívoca, lo que nos obliga a hacer valer sus términos según consignados en la ley, sin necesidad de acudir a recursos alternos más allá de su letra.
No podemos, por lo tanto, dictaminar que la Ley Núm. 95 discrimina de su faz contra el aspecto negativo de la Cláusula de Comercio de la Constitución Federal, ya que —según redactada— no tiene como fin beneficiar a los pro-ductores locales en detrimento de los importadores.
Dicho esto, nos toca resolver si hubo discrimen desde la perspectiva práctica en la ejecución de la Ley Núm. 95. Res-pondemos en la afirmativa.
En la implementación de la Ley Núm. 95 consta una incuestionable intención y efecto discriminatorio. A través *82 del Fondo se patrocinó exclusivamente el adelanto de la industria local dejando a un lado los intereses de la com-petencia proveniente de fuera de la Isla. Al corto tiempo de haberse aprobado la Ley Núm. 95 ya existía tensión entre el grupo local y los importadores.
Dentro del periodo aproximado de un año de aprobada la Ley Núm. 95 surgieron conflictos entre ambos grupos. Ello suscitó una reunión el 7 de diciembre de 1993 con el entonces Secretario de Agricultura, en la cual se encontra-ban también presentes miembros de la Junta Administrativa. Dicha reunión se llevó a cabo con el pro-pósito de propulsar la enmienda de la Ley Núm. 95 para eliminar del todo la participación de los importadores en el Fondo y de este modo limitar el alcance de la Ley Núm. 95 exclusivamente a la industria de carne de res del país. Se-gún consta en la Minuta correspondiente, el representante de los importadores adscribió la situación imperante a “la dificultad de relaciones entre importadores y productores locales [a la vez que entendió] que es difícil que [el Fondo según instituido] pueda funcionar adecuadamente”. Apén-dice de la Petición de certiorari, pág. 103.
Hubo consenso entre los presentes sobre esta particular enmienda y la Junta Administrativa se comprometió a pre-parar un borrador del proyecto de enmiendas para traba-jarse conjuntamente con el Departamento de Agricultura para que eliminara el componente de los importadores. Apéndice de la Petición de certiorari, pág. 102.
En el Informe Mensual de la Oficina para la Reglamen-tación de la Industria de Carne de Res correspondiente al mes de junio de 1995,([15]) se mencionan reuniones en dos supermercados “relacionado con la venta de carne del país”. Apéndice de la Petición de certiorari, pág. 117. Por otra parte, se hace referencia a varias reuniones con la *83 Agencia Publimer para preparar la promoción de la carne de res del país. Asimismo, indica sobre su presentación a la Junta Administrativa y al Secretario de Agricultura e in-forma que la promoción está programada para salir al aire durante el mes de septiembre.
Así las cosas, el Fondo contrató con la Compañía Publi-mer para el desarrollo de una campaña publicitaria diri-gida a promocionar únicamente el consumo de carne de res del país. El documento de la campaña oficial es del 14 de junio de 1995. Apéndice de la Petición de certiorari, págs. 104-118. Todos los objetivos allí fijados inciden en el pro-ducto local y se resumen en los aspectos publicitarios si-guientes: (1) crear conciencia de que existe una alternativa real en la carne de res de P.R.; (2) fomentar el consumo de carne de res de P.R.; (3) crear imagen positiva; (4) crear reconocimiento de nombre, y (5) demostrar frescura y cali-dad del producto. Apéndice de la Petición de certiorari, pág. 233.
La campaña, que se difundió ampliamente a través de la radio y la prensa local, se extendió desde septiembre a noviembre de 1995. Apéndice de la Petición de certiorari, págs. 120-122. Su costo total ascendió a $279,869.85. Apéndice de la Petición de certiorari, pág. 119.
No cabe duda de que todos los anuncios pautados se circunscribieron a impulsar única y exclusivamente la pro-ducción de carne local. Mediante la mencionada publicidad se destacaron las bondades del producto elaborado en la Isla, particularmente su frescura, sabor y calidad. A la vez se acentuó su origen, indicando que ello constituía “lo me-jor de nuestra tierra”. Apéndice de la Petición de certiorari, págs. 123-148.
Resulta evidente que, al utilizar los recaudos decretados por la Ley Núm. 95 para la promoción exclusiva de la industria local en detrimento de los provenientes de fuera de la Isla, se les estaba cobrando a los importadores un recaudo con fines estrictamente proteccionistas, en con- *84 travención a las disposiciones de la Cláusula de Comercio durmiente. ([16])
Esta finalidad proteccionista quedó también puesta de manifiesto con la aprobación de la Ley Núm. 238. Este nuevo precepto cristalizó la política pública gubernamental prevaleciente en ese momento, la cual pretendía “promover el desarrollo de la Industria Agropecuaria y sentar las bases para el apoderamiento, por parte de los agroempresa-rios de sus negocios agrícolas”. Exposición de Motivos de la Ley Núm. 238 (1996 (Parte 2) Leyes de Puerto Rico 1306). En otras palabras, a través de la nueva legislación se es-taba proporcionando un instrumento para el autocontrol del mencionado sector, a través de acuerdos entre sus com-ponentes, limitando el rol del gobierno a uno de mero facilitador.
A base de lo antes expuesto, decretamos que la Ley Núm. 95 en su implementación, atenta contra los princi-pios que alientan el postulado constitucional que nos ocupa. No cabe duda de que se utilizó el mecanismo de las aportaciones requeridas a los importadores para beneficio exclusivo de la industria nativa promoviendo el consumo de su producto y adelantando sus intereses en el mercado local. Esta gestión, a todas luces proteccionista, clara-mente lesiona los intereses de las entidades importadoras quienes están obligadas a sobrellevar una carga económica desigual por la mera razón de estar establecidas fuera de la Isla.
Es importante destacar que no estamos aquí frente a las acciones del Gobierno actuando al amparo del manto de sus funciones de poder de razón de estado (“police power”), mediante la cual se utilizan fondos públicos para proteger la salud de sus constituyentes o reforzar la economía a través de subsidios o programas dirigidos a fortalecer la *85 industria local. Por el contrario, nuestro análisis se en-cuentra centrado en la validez del esquema establecido me-diante una cuota mandatoria asignada a los importadores con el exclusivo fin y propósito de adelantar la causa de sus competidores nativos.
En vista de nuestra determinación, se hace innecesario discutir los errores restantes consignados por la parte peticionaria.
VIII

Decretamos, por lo tanto, que por constituir una medida protectora discriminatoria, la Ley Núm. 95, en su imple-mentación, vulnera la Cláusula de Comercio de la Consti-tución de Estados Unidos en su estado durmiente. Por con-siguiente, se revoca la sentencia recurrida.

Se dictará sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta disintió con una opinión escrita, a la que se unió el Juez Presidente Señor Hernández Denton. La Juez Asociada Señora Rodríguez Rodríguez concurrió y disintió con una opinión escrita.
— O —

(1) Como discutiremos más adelante, solamente atenderemos el primer y tercer error señalados.

(2) La Ley Núm. 238 entró en vigor el 1 de enero de 1997. Art. 15 de la Ley Núm. 238.

(3) En el segundo error se cuestiona la constitucionalidad de la Ley Núm. 95 a la luz de los derechos a la libre asociación y expresión, mientras que en el cuarto seña-lamiento la peticionaria aduce que es ilegal que los dineros que le son requeridos *55 mediante la Ley Núm. 95 pasen al fondo creado por la Ley Núm. 238 para uso exclusivo de los intereses de la industria de carne local.

(4) En su alegato, el Gobierno se limitó a objetar nuestra consideración de dicho planteamiento, sin entrar a discutir los méritos de éste.

(5) La Cláusula de Comercio dispone que el Congreso tendrá la facultad “[piara reglamentar el comercio con naciones extranjeras, así como entre los estados y con las tribus indias”. Art. 1, Sec. 8, Const. EE.UU., L.P.R.A., Tomo 1, ed. 2008, pág. 167.

(6) El Art. IV, Sec. 3, Cl. 2 de la Constitución Federal provee lo siguiente: “The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State”.

(7) Actualmente consignado en el Art. 38 de la Ley de Relaciones Federales con Puerto Rico (Ley de Relaciones Federales), L.P.R.A., Tomo 1, See. 38.

(8) Art. 9 de la Ley de Relaciones Federales, L.P.R.A., Tomo 1, See. 9.

(9) Art. VI, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1.

(10) Explica el Juez Scalia que no existe base histórica para interpretar dicha disposición constitucional más allá de la autorización al Congreso para reglamentar el comercio. Manifiesta que él estaría dispuesto a acatar, conforme el principio de stare decisis, decisiones anteriores sobre esta doctrina cuando la disposición estatal discrimina de su faz contra el comercio interestatal o estén en juego leyes idénticas a estatutos previamente declarados inconstitucionales. Véase United Haulers Assn., *73 Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U.S. 330, 348 (2007), opinión concurrente en parte del Juez Scalia (resumiendo su posición al res-pecto según expuesta en casos anteriores).
El Juez Thomas, por su parte, formula el debate de la manera siguiente: “[Application of the negative Commerce Clause turns solely on policy considerations, not on the Constitution. Because this Court has no policy role in regulating interstate commerce, I would discard the Court’s negative Commerce Clause jurisprudence”. Véase United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, supra, pág. 349, opinión concurrente del Juez Thomas (haciendo un recuento de sus expresiones similares previamente vertidas sobre este particular).

(11) Para una discusión sobre la tendencia del Tribunal Supremo federal a eva-luar los ataques a legislación federal promulgada dentro del ámbito de poder de la Cláusula de Comercio utilizado al amparo del marco revisor de la faz del estatuto en lugar del método tradicional de medir su validez según su aplicación, véanse: D.L. Franklin, Facial Challenges, Legislative Purpose, and the Commerce Clause, 92 Iowa L. Rev. 41 (noviembre 2006); J.S. Baker, Jr., Jurisdictional and Separation of Powers Strategies to Limit the Expansion of Federal Crimes, 54 Am. U.L. Rev. 545 (febrero 2005); N. Stewart, Nota, Turning the Commerce Clause Challenge “on its Face”: Why Federal Commerce Clause Statutes Demand Facial Challenges, 55 Case W. Res. L. Rev. 161 (otoño 2004).

(12) La Cláusula de Comercio en su aspecto durmiente aplica igualmente a me-didas protectoras que interfieren con el comercio extranjero. La validez de contribu-ciones a productos del extranjero se mide a base de los cuatro factores enuneiadqs en Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977), y dos adicionales. Éstos son: (1) que no exista el riesgo de imposición de contribuciones múltiples a nivel internacional, y (2) que la contribución no impida que el gobierno federal se exprese con “una voz” al regular las relaciones comerciales con naciones extranjeras. Japan Line, Ltd. v. Los Angeles County, 441 U.S. 434 (1979); Iberia v. Srio. de Hacienda, 135 D.P.R. 57 (1994); Gómez Hnos., Inc. v. Srio. de Hacienda, 114 D.P.R. 367 (1983).

(13) En ningún momento se cuestiona la facultad gubernamental para exigir la aportación como tampoco se impugna la fórmula dispuesta en la Ley Núm. 95 para fijar el monto de las tarifas aplicables a los importadores frente a aquellas corres-pondientes a la producción de carne local.

(14) Aprovechamos para mencionar la diferencia en el enfoque utilizado al ex-plorar la constitucionalidad de un estatuto desde la perspectiva de su faz a diferencia de en su aplicación. Al declarar inconstitucional una ley de su faz se está juzgando la función legisladora. En otras palabras, se examina si al promulgar el estatuto la Legislatura se excedió de los poderes que le fueron constitucionalmente conferidos o transgredió algún derecho individual. Por otra parte, cuando se menciona la incons-titucionalidad de un estatuto en su aplicación se refiere a las acciones u omisiones del ejecutivo en la implementación del mandato legislativo. Véase N. Quinn Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev. 1209, 1227 (mayo 2010).

(15) Este informe, preparado por el Sr. Josep Marull Tauler, entonces Adminis-trador del Fondo y fechado el 18 de septiembre de 1995, iba dirigido al Secretario de Agricultura.

(16) Notamos que, pese el costo considerable de la publicidad en cuestión, no consta en autos evidencia alguna que acredite qué otro uso, si alguno, se le dio al presupuesto allegado al Fondo en virtud de la LeyNúm. 95.